David GOFF et al.

v.

ELMO GREER & SONS
CONSTRUCTION
CO., INC.

Supreme Court of Tennessee,
at Nashville.

June 2, 2009 Session.

Nov. 3, 2009.

John C. Knowles, Sparta, Tennessee, Jon E. Jones, Cookeville, Tennessee, and John P. Pryor, Smithville, Tennessee, for the appellants, David Goff, Joyce Goff, and Agnes Goff.

Linda J. Hamilton Mowles, Knoxville, Tennessee, for appellee, Elmo Greer & Sons Construction Co., Inc.

## OPINION

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., and GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

The owners of real property filed suit against a construction company hired by the State of Tennessee to widen a highway adjacent to their property. The property owners had a contract with the construction company that allowed it to place equipment and construction materials on their land in exchange for compensation. Following the completion of the road project, the property owners filed suit claiming that the construction company failed to pay the amount due under the contract and caused blasting damage to their house and vehicles. They also claimed that the construction company illegally buried debris on their property. At trial, the parties stipulated that the construction company was liable for breach of contract in the amount of $5,355.50. A jury then determined that the construction company was strictly liable for harm caused by its blasting activities in the amount of $9,510, and that burying debris on the plaintiffs' property constituted a nuisance for which the company was liable for $3,305. The jury also returned an award of $2 million in punitive damages which the trial court modified to $1 million to conform to the amount requested in the pleadings. The Court of Appeals affirmed the trial court's judgment as to liability, but reversed the award of punitive damages based on a finding that the trial court improperly considered Tennessee's environmental laws in approving the award. After careful review, we conclude that the evidence supports the jury's award of punitive damages and that the trial court properly considered Tennessee's environmental statutes in approving that award. We further conclude that the amount of the punitive damages award does violate the construction company's due process rights and must be modified to $500,000. Finally, we find no error in the trial court's instructions to the jury regarding punitive damages or its denial of a motion for mistrial based on a mention of insurance during the trial. Accordingly, the decision of the Court of Appeals is reversed and the judgment of the trial court is reinstated as modified.

### Factual & Procedural History

David Goff and his mother, Agnes Goff, own 400 acres of pasture and timber land adjacent to Highway 111 in Sparta, Tennessee. Mr. Goff and his wife, Joyce Goff, reside in a house they built on the property in 1978. As a result of highway development projects, including the project at issue in this case, the Goffs' home is encircled by four lanes of Highway 111 to the front of their house and four lanes to the rear of their house.

In 1993, the State of Tennessee contracted with Elmo Greer & Sons Construction Company, Inc. ("Elmo Greer") to widen from two to four lanes the portion of Highway 111 adjacent to the Goffs' property.[1] Realizing that extensive blasting would be required and that the project would produce excess dirt and rock, Elmo Greer, on January 7, 1994, contracted with the Goffs to place the excess material on a portion of their land consisting of five to seven acres ("fill area"). Elmo Greer agreed to pay the Goffs ten cents per cubic yard of fill material placed on their property. Elmo Greer further agreed that the fill area would be left in a "neat and graded condition," a point of particular concern to the Goffs because they hoped to have a

---

1. Elmo Greer, which is based in Kentucky, is described in the record as a "heavy highway construction company" that builds highways, dams, and bridges. At the time of trial, Elmo Greer had at least twenty major projects going on in ten different states, including projects in Tennessee. The State of Tennessee paid the company approximately $13 million for its work on Highway 111.

suitable building site when construction on the highway was completed.

Construction on Highway 111 lasted approximately three years. Starting in 1994, Elmo Greer blasted extensively the area around Highway 111, sometimes within 150 feet of the Goffs' home, and placed excess dirt and rock on their property. Rock from the blasting damaged the Goffs' vehicles and the roof of their house and nearly hit one of their children. During the construction process, Mr. Goff periodically visited the fill area of his property and became concerned with Elmo Greer's business practices. Mr. Goff noticed large motor oil deposits in the area where Elmo Greer staged its equipment. He described "large areas" of the ground that were "black" with oil and grease where Elmo Greer repaired and changed the oil on its equipment and vehicles. He also noticed that the fill area was being used to store tires, batteries, other vehicle parts, fifty-five gallon oil drums, and other items. When Mr. Goff questioned Elmo Greer's onsite personnel about the condition of the fill area he was repeatedly told "not to worry about it" and "we'll clean it up."

Unsatisfied with these reassurances, Mr. Goff began taking pictures of the fill area, focusing on several large tires buried beneath large rocks. According to Mr. Goff, there were four or five "huge" tires that had "big rocks" on them. He testified that "in seeing that, you know, you wouldn't think they'd dump [big rocks] on [the tires] and then take [the big rocks] off and haul the tires off. So, I—I got my camera and I made pictures." Mr. Goff also focused his attention on boxes, pipes, oily rags, oil drums piled in the fill area, and other discarded waste.

Upon completing the construction project in 1997, Elmo Greer removed its equipment from the Goffs' property and compacted, graded, and seeded the fill area. Elmo Greer did not, however, compensate the Goffs for the fill material placed on their land as provided for in their agreement, prompting the Goffs to file suit for breach of contract. The Goffs also claimed in their suit that Elmo Greer was strictly liable for blasting damage to their house and vehicles, and further that Elmo Greer had unlawfully buried discarded waste on their property.

Convinced that Elmo Greer had buried tires and other materials on his land, Mr. Goff paid Lloyd Shores Trucking and Excavating ("Lloyd Shores") $3,305 to twice dig up a small portion of the fill area. During the first dig, Lloyd Shores unearthed one large tire, eight feet tall and weighing at least one ton, and a smaller tire described as a regular truck tire. These tires were buried eight to nine feet deep under a layer of compacted rocks, some of which were the size of a pick-up truck. During the second dig, Lloyd Shores unearthed some steel pipes and four more tires of various sizes. It is undisputed that these items were in the fill area of the Goffs' property.

After discovering buried solid waste on their land, the Goffs amended their complaint by alleging that Elmo Greer

> did willfully, unlawfully, intentionally, and fraudulently deposit, bury, hide and conceal upon [the Goffs'] real property ... waste materials, used oil, petroleum, truck tires, huge earth-moving tires and other waste materials that are prohibited to be disposed of in such manner by the laws of the State of Tennessee ... all without proper and lawful permitting and all without the consent or approval of the [Goffs].

The amended complaint sought $250,000 in compensatory damages and $1 million in punitive damages. The Goffs subsequently amended their complaint a second time,

adding a nuisance cause of action claiming that Elmo Greer

> commit[ted] acts of nuisance ... by spilling upon the property oil and petroleum products and by burying and concealing trash, garbage, waste products, rubber tires, oil filters, used and discarded machinery parts, all without permission or authorization of the [Goffs] and did thereby create an unauthorized, unlicensed, and prohibited landfill.

This second amended complaint sought $500,000 in compensatory damages and $1 million in punitive damages.

The Goffs' discovery of buried solid waste in the fill area of their land prompted Elmo Greer to conduct its own investigation by hiring AquAeTer, Inc. to conduct an environmental site assessment. AquAeTer, Inc. took soil samples from the fill area and analyzed the samples "for hazardous materials, hazardous constituents, [and] any chemicals that may have been involved with any operations that were held on the site." The test results revealed "no hazardous materials or hazardous waste" in the fill area.

A three-day jury trial commenced on June 28, 2006. Mr. Goff testified about the pictures he had taken of the fill area and the debris unearthed from his land. He testified about seeing the oil spills, batteries, vehicle parts, fifty-five gallon oil drums, and other items stored on his property. He also related how he had repeatedly questioned Elmo Greer about the condition of the fill area and how he sought assurances that nothing but rock and dirt would be buried on his land. He specifically told Elmo Greer not to bury the "huge tires" he had seen. Elmo Greer's personnel repeatedly told him "not to worry about it" and "we'll clean it up." Mr. Goff nonetheless remained concerned that the waste materials he had seen would be buried.

Ken Johnson, a geologist, testified that the only way to certify that the fill area was free of solid or hazardous waste would be to excavate the entire 53,555 cubic yards of fill area at an estimated cost of $318,000. Mr. Johnson testified that because six tires were unearthed in the fill area, he would only certify the property as clean after the entire area was excavated. With regard to hazardous waste, Mr. Johnson stated that excavation would not be necessary for him to certify the property because the soil samples taken from the fill area did not reveal the presence of any such waste. Mr. Johnson also testified that, given their size, the buried tires could not have been accidentally covered up, noting that it had to be a conscious and intentional act to bury them. He did not recommend excavating the property to remove the tires because tires do not cause a health concern and do not deteriorate to the point of contaminating the soil. Mr. Johnson testified that while tires are not considered a hazardous waste, tires do cause an environmental concern, noting that "there are guidelines against improperly dumping [tires]."

William Parrish, a real estate appraiser, testified that the fill area was worth $10,000 an acre assuming it was free from any buried solid waste. If the property did have solid waste on it, Mr. Parrish testified that it would be worth zero because latent defects, such as buried solid waste, would have to be disclosed to a potential buyer. Based on the size of the fill area and the cost per cubic yard to excavate, Mr. Parrish testified that it would cost approximately $375,000 to "cure" the fill area of any latent defects.

Michael Corn, an environmental engineer with AquAeTer, Inc., testified that there were "no hazardous materials or hazardous waste" in the fill area. He stated that "tires are not hazardous waste or

hazardous materials." Mr. Corn also testified that with soil sampling, solid waste—such as a tire—would only be discovered if the probe inserted into the ground happened to make direct contact with the solid waste. He noted that the soil assessment conducted on the Goffs' property was only "looking for hazardous waste and hazardous materials." Based on the results of that assessment, Mr. Corn believed that it was unnecessary to excavate the fill area or conduct more testing. He also stated his view that a few tires and pipes buried on private property would not create a "problem with the Solid Waste Disposal Act." Mr. Corn agreed, however, that pursuant to the Solid Waste Disposal Act, waste tires should not be buried in landfills but, instead, should be stored until they can be "transported to an appropriate facility to be used for an improved beneficial end use." He also agreed that the Goffs' property was not a designated landfill which could store tires.

Terry Evans, a real estate appraiser hired by Elmo Greer, testified about the value of the Goffs' property at the time of trial. Mr. Evans explained that, after reviewing the soil assessment report, the photos of the fill area, and the unearthed tires and pipes, he saw nothing to indicate that the fill area was contaminated. He stated, however, that a potential buyer "might use this information to leverage a little better deal and might ask that the sale price be lower maybe 3, 5 percent, maybe a little bit lower."

Lee Anderson, Elmo Greer's chief engineer and project manager, testified that he visited the construction site once or twice a month. When asked about the use of the fill area during the construction process, Mr. Anderson testified that the area was used to change the oil on Elmo Greer's equipment. According to Mr. Anderson, company policy required that used oil be placed in fifty-five gallon drums and sent to Elmo Greer's headquarters in Kentucky where it is recycled and used to heat their offices. As to tires, Mr. Anderson conceded that tires were stacked in the fill area during construction, but explained that once enough tires were stacked they were taken to Elmo Greer's headquarters to determine whether they could be retreaded. If not, the tires were shredded and sent to a landfill. Mr. Anderson testified that there is a financial cost associated with disposing of tires in a landfill.

After Elmo Greer completed its work, Mr. Anderson inspected the Goffs' property and observed tires lying on the fill area. He "called the shop and told them to come pick up the equipment, tires, and other surplus equipment." When asked about the six tires found buried in the fill area, Mr. Anderson testified, "I have no idea. . . . It makes sense that [the tires found] were ours but I don't know that. They could be [Mr. Goff's tires]." He did admit, however, that Elmo Greer used tires like those unearthed from the fill area. He also testified that the company went through "hundreds" of tires over the course of the project because "limestone rock punches holes in them and wears them out." When asked why Elmo Greer had policies regarding what to do with used oil and tires, Mr. Anderson responded that it was "good business to meet the regulations and requirements. There's no question as to what we're supposed to do and how we're supposed to do it." He acknowledged that Elmo Greer is obligated to follow "state and federal regulations."

Johnny Michael Apple, Director of the Division of Solid Waste Management for the Tennessee Department of Environment and Conservation, testified that, other than some tires needing "to be properly disposed of," there was nothing unusual

"that would indicate [the need for] further investigation." He agreed, however, that discarded whole tires are solid waste and that solid waste is not permitted to be buried outside of an approved landfill and that doing so violates state law. Mr. Apple explained that lawfully disposing of a tire requires shredding it. He also acknowledged that one who improperly disposes of solid waste is subject to a civil penalty of up to $5,000 per day for each violation. *See* Tenn.Code Ann. § 68–211–117(a)(1) (2006). Finally, when presented with a hypothetical scenario that tires were discovered eight to ten feet below ground buried underneath heavy limestone rock and asked whether these facts demonstrated an intent to bury tires, Mr. Johnson agreed that those facts "would show that someone was trying to hide those [tires]."

Following the close of the proof, the trial court instructed the jury on the claims of "environmental tort," nuisance, and strict liability for blasting. On a special verdict form, however, the jury was asked to determine whether Elmo Greer had caused an "environmental hazard" to the Goffs' property. The phrase "environmental hazard" was not defined in the charge. Elmo Greer stipulated that it was liable for breach of contract in the amount of $5,355.50, thus resolving the Goffs' contract claim.[2] Regarding the Goffs' strict liability claim, the jury found that Elmo Greer was strictly liable for the blasting damage to their residence and vehicles and awarded $9,510 in damages.[3] The jury also found that while Elmo Greer had not caused an "environmental hazard" on the Goffs' land, it determined that Elmo Greer had created a nuisance and awarded $3,305

in compensatory damages. The jury also determined that the Goffs were entitled to punitive damages.

During the second phase of the trial to consider the amount of punitive damages, Mr. Anderson, Elmo Greer's chief engineer and manager of the Highway 111 project, was the only witness to testify. He testified that Elmo Greer had a net worth of over $46 million for the year 2000; $50 million for the year 2001; $51 million for the year 2002; and $54.3 million for the year 2003. He also reiterated that Elmo Greer's policy "is to return ... tires to [the home office] because you have to put [the tires] on a machine to see if [they] can be sectioned or recapped. You can't tell on a job." Mr. Anderson also testified that Elmo Greer would have been subject to penalties under its contract with the State, including losing the right to continue with the project or not receiving payment for the project, had Elmo Greer been caught burying tires.

Following Mr. Anderson's testimony and further instructions from the court, the jury awarded $2 million in punitive damages. Elmo Greer subsequently moved for a mistrial based on a mention of insurance during the trial. The trial court denied the motion. Elmo Greer also filed a motion to alter or amend the judgment or for a remittitur of the punitive damages award. The trial court modified the award of punitive damages to $1 million to conform to the amount the Goffs sought in their complaint,[4] but otherwise denied Elmo Greer's motion to alter or amend. The trial court approved the punitive award after analyzing the factors the jury was instructed to consider under *Hodges v.*

---

2. This portion of the judgment is not at issue on appeal.

3. No issue has been raised on appeal regarding this award.

4. *See Coffey v. Fayette Tubular Prods.,* 929 S.W.2d 326, 328–29 (Tenn.1996).

*S.C. Toof & Co.*, 833 S.W.2d 896, 901–02 (Tenn.1992).

The Court of Appeals reversed the award of punitive damages, concluding that the trial court erroneously relied on Tennessee's environmental statutes in affirming the award given the jury's finding that Elmo Greer had not committed an environmental hazard. The Court of Appeals thus remanded the case to the trial court to reconsider the award of punitive damages based on the nuisance theory alone. The intermediate court did not address whether the award violated Elmo Greer's due process rights.

The Goffs have appealed to this Court, asserting that the Court of Appeals erred in remanding the case to the trial court to re-evaluate the punitive damages award considering only the nuisance claim to the exclusion of Tennessee's environmental laws. The Goffs assert that the same facts support both the environmental tort and nuisance claims and, therefore, the trial court properly considered Tennessee's environmental statutes in upholding the punitive award. Elmo Greer responds that the Court of Appeals correctly determined that the trial court erred in considering Tennessee's environmental laws in affirming the punitive award and, in any event, no material evidence exists to support an award of punitive damages. Further, Elmo Greer maintains that the trial court gave incorrect jury instructions regarding punitive damages and that the amount of the award is excessive. Finally, Elmo Greer argues that the trial court erred by denying its motion for a mistrial based on the trial court's mention of insurance during the trial.

---

**5.** The record does not reflect what jury instructions were requested by the Goffs.

## Analysis

### I. "Environmental Tort" & "Environmental Hazard"

As a threshold matter, we are compelled to address a source of significant confusion in this case stemming from the use of the term "environmental tort" in the jury instructions. The Goffs' original complaint did not refer to or allege any "environmental tort." Instead, it alleged that Elmo Greer, "in violation of environmental laws," buried refuse and other objects on the Goffs' property without their permission. The Goffs' first amended complaint alleged that Elmo Greer intentionally buried and concealed waste prohibited by state and federal law, but it likewise did not explicitly state a cause of action for "environmental tort." In their second amended complaint, the Goffs added a nuisance claim alleging that the spilling of oil and petroleum products and the burying and concealment of trash and tires constituted a nuisance. This complaint, like the other complaints, did not allege an "environmental tort."

The first mention of "environmental tort" in the record comes not from the pleadings filed by the Goffs, but from Elmo Greer's trial brief which stated that the Goffs sought to recover for an "environmental tort and nuisance caused by environmental tort." A special verdict form proposed by Elmo Greer requested that the jury decide four causes of action—breach of contract, strict liability, "environmental hazard," and nuisance. There was no request by Elmo Greer to charge the jury on a cause of action for "environmental tort,"[5] yet that is precisely what happened.[6] Compounding the confusion, the

---

**6.** The trial court's instruction on "environmental tort" provided in part:

jury was provided a verdict form containing the four causes of action proposed by Elmo Greer, including the question, "do you find that [Elmo Greer] caused an *environmental hazard* to the Goff property?"[7] (Emphasis added). The phrase "environmental hazard" was not defined in the jury instructions. Instead, there was the instruction on "environmental tort." This instruction was then followed by a separate instruction on nuisance,[8] along with a description of the damages that could be awarded for "a nuisance ... by virtue of an environmental tort." The jury determined that Elmo Greer did not commit an "environmental hazard" which, again, was never defined.

Against this unusual and confusing backdrop, we note that Tennessee, recognizing the dangers inherent in hazardous waste, has adopted several statutory schemes addressing that topic. For example, the Tennessee Hazardous Waste Management Act of 1977, Tenn.Code Ann. §§ 68–212–101–121 (2006 & Supp.2009), defines hazardous waste as that which may "(A) [c]ause, or significantly contribute to an increase in mortality or an increase in serious irreversible illness or incapacitating reversible illness; or (B) [p]ose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, disposed of, or otherwise managed." *Id.* § 68–212–104(8).[9] The Act, which regulates the storage, transportation, treatment, and disposal of hazardous waste, *see id.* § 68–212–102(1), provides that criminal and civil penalties may be imposed upon one who violates its provisions, *see id.* § 68–212–114(a), (b), (c). The Act does not, however, specifically provide for the filing of an action by a private individual who alleges harm based on another's violation of the Act. Rather, the Act provides that "[a]ny person qualified by law" may intervene in an action brought by regulatory officials charged

*Environmental Tort*

It is unlawful to dispose of solid waste in violation of the *Solid Waste Disposal Act of the State of Tennessee.* No solid waste processing facility or disposal facility or site in any political subdivision of this state shall be operated or maintained by any person unless such person has registered with the Commissioner in the name of such person for the specified facility or site.

Whole waste tires, lead acid batteries, and used oil must be disposed of in a State approved site.

It is unlawful to construct, alter or operate a solid waste processing or disposal facility or site in violation of the rules and regulations or orders of the Commissioner or in such a manner as to create a public nuisance; or to dispose of solid waste in land not designated and approved as a solid waste site.

7. Although the proposed special verdict form submitted by Elmo Greer was made part of the record, the actual verdict form submitted to the jury is not part of the record. However, we have derived its language and the responses of the jury from the actions of the trial judge in reading the questions aloud after the jury returned its verdict.

8. As to nuisance, the jury was instructed as follows:

A nuisance is an unreasonable or unlawful use of property that results in material or substantial annoyance, inconvenience, discomfort, harm, or injury to the [Goffs], or the [Goffs'] free use, possession, or occupation of the [Goffs'] own property.... A nuisance extends to everything that endangers health or life, offends the senses, or obstructs the reasonable and comfortable use of property. The standard for determining whether a particular use of property is a nuisance is it's [sic] effect upon persons of ordinary health and sensibilities, and not upon those who are unusually sensitive or peculiarly susceptible to the thing complained of.

9. Effective June 25, 2009, subsection (8) became subsection (9). *See* 2009 Tenn. Pub. Acts ch. 531, §§ 7, 63.

with enforcing the Act, *see id.* § 68–212–114(d), and it allows an individual to file a complaint with regulatory officials against an alleged violator, *id.* § 68–212–117(a). Further, "any citizen" has the right to intervene on the ground that the penalties or remedies imposed by regulatory officials are inadequate or are based on erroneous findings of fact. *Id.* § 68–212–114(e)(3)(B).

Tennessee also has the Hazardous Waste Management Act of 1983, Tenn. Code Ann. §§ 68–212–201–227 (2006 & Supp.2009), which likewise imposes civil and criminal penalties for violating its provisions, *id.* § 68–212–213. This Act gives regulatory officials supervision over enforcement and gives citizens rights to intervene similar to those granted under the 1977 Act. *See id.* § 68–212–215.

There is also the Tennessee Hazardous Waste Reduction Act of 1990, Tenn.Code Ann. §§ 68–212–301–312 (2006 & Supp. 2009), which creates additional rules and regulations and imposes an additional civil penalty of up to $10,000 for each day a violation of the Act continues. *Id.* § 68–212–309. No specific right of individuals to intervene is provided for in the Hazardous Waste Reduction Act of 1990.

In addition to the various hazardous waste acts, the legislature adopted in 1969 the Tennessee Solid Waste Disposal Act, Tenn.Code Ann. § § 68–211–101–124 (2006 & Supp.2009), which defines "solid waste" as including

> garbage, trash, refuse, abandoned material, spent material, byproducts, scrap, ash, sludge, and all discarded material including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, and agricultural operations, and from community activities. Solid waste includes, without limitation, recyclable material when it is discarded or when it is used in a manner constituting disposal.

*Id.* § 68–211–103(8). The Solid Waste Disposal Act, like the statutes dealing with hazard waste, provides for criminal and civil penalties for a violation of its provisions. *See id.* §§ 68–211–114 & –117. Although the Solid Waste Disposal Act would apply to circumstances like the burial of tires on private property, our courts have recognized that it does not provide a private right of action for persons harmed by a violation of its provisions. *See Wayne County v. Tenn. Solid Waste Disposal Control Bd.,* 756 S.W.2d 274, 283 (Tenn.Ct. App.1988). Instead, such persons may seek redress under other legal theories, such as nuisance. *Id.* Furthermore, in appropriate cases, a cause of action for trespass, negligence, or strict liability could be brought.

Given the language of these various environmental laws, along with prior cases addressing the Solid Waste Disposal Act itself, it is unclear to this Court why the jury was instructed on "environmental tort." Arguably, the Goffs lacked standing to bring any such claim. However, since the jury did not find the existence of any environmental tort and the issue has not been raised by either side on appeal, it is unnecessary for us to decide at this time whether a private right of action exists for a claimed violation of the state's environmental statutes. We merely observe at this point that the same facts supporting a violation of the Solid Waste Disposal Act can constitute a nuisance, as found by the jury in this case.

## II. The Punitive Damages Award

As indicated above, after finding that Elmo Greer created a nuisance, the jury awarded $2 million in punitive damages. The trial court modified the award to $1 million to conform to the amount the Goffs

sought in their complaint. Elmo Greer attacks the modified punitive damage award on four grounds. First, Elmo Greer asserts that the evidence is insufficient to support any award of punitive damages. Second, Elmo Greer argues that the trial court erred in considering Tennessee's environmental statutes in affirming the punitive damage award. Third, Elmo Greer argues that the amount of the punitive award is excessive to the point that it violates due process under standards adopted by the United States Supreme Court in *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and its progeny. And fourth, Elmo Greer contends that, because the Goffs pled only intentional and fraudulent conduct, the trial court erred when it instructed the jury that intentional or reckless conduct can form the basis for punitive damages and further erred in failing to instruct the jury that punitive damages are proper only in egregious circumstances. We address each of these arguments in turn.

### A. Sufficiency of the Evidence Supporting Punitive Damages

■ Compensatory and punitive damage awards serve vastly different purposes. Compensatory damages are intended to compensate an injured plaintiff for personal injury or property damage and thereby make the plaintiff whole again. *Hodges,* 833 S.W.2d at 902. In contrast, punitive damages are intended to "punish a defendant, to deter him from committing acts of a similar nature, and to make a public example of him." *Huckeby v. Spangler,* 563 S.W.2d 555, 558–59 (Tenn. 1978). Punitive damages are thus appropriate only in the most egregious cases and, consequently, a verdict imposing such damages must be supported by clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly. *Hodges,* 833 S.W.2d at 901. Evidence is clear and convincing when it leaves "no serious or substantial doubt about the correctness of the conclusions drawn." *Id.* at 901 n. 3. In other words, the evidence must be such that the truth of the facts asserted be "highly probable." *Teter v. Republic Parking Sys., Inc.,* 181 S.W.3d 330, 341 (Tenn.2005).

■ In this case, the jury found that the Goffs had proven by clear and convincing evidence that Elmo Greer was "guilty of egregious, intentional or reckless acts" and thus punitive damages were warranted. Elmo Greer asserts that the record does not support the jury's conclusion and therefore the punitive damage award should be reversed in its entirety. We thus review the record to determine whether there is material evidence to support the jury's finding that there is no serious or substantial doubt that Elmo Greer acted intentionally [10] or recklessly.[11] *Flax v. DaimlerChrysler Corp.,* 272 S.W.3d 521, 532 (Tenn.2008).

The jury had evidence before it that the tires discovered on the Goffs' property were buried eight to nine feet deep under a layer of compacted rocks, some of which were the size of a pick-up truck. One of these tires was eight feet tall and weighed

---

10. A person acts intentionally when "it is the person's conscious objective or desire to engage in the conduct or cause the result." *Hodges,* 833 S.W.2d at 901.

11. A person acts recklessly when the person "is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *Hodges,* 833 S.W.2d at 901.

at least one ton. It is undisputed that the tires, along with the steel pipes, were unearthed in the fill area of the Goffs' property. Ken Johnson, the geologist who testified for the Goffs, stated that given their size the buried tires could not have been accidentally covered up, noting that it had to be a conscious and intentional act to bury them. One of Elmo Greer's witnesses, Johnny Michael Apple, likewise testified that "someone was trying to hide those [tires]." Accordingly, the jury heard witnesses proffered by both parties asserting that the only way to bury large tires eight or nine feet underground would be to do so intentionally. Further, the jury had before it the testimony of Mr. Goff that he repeatedly questioned Elmo Greer's employees about the condition of the fill area and how he sought assurances that nothing but rock and dirt would be buried on his land. He specifically told Elmo Greer not to bury the tires he had seen. Elmo Greer's personnel repeatedly told him "not to worry about it" and "we'll clean it up." The tires were nonetheless buried. Although Elmo Greer's chief engineer, Mr. Anderson, refused to acknowledge that the unearthed tires belonged to Elmo Greer or that Elmo Greer buried the tires, we are persuaded that the jury reasonably concluded that Elmo Greer acted intentionally, or at least recklessly, in burying the tires.

Additionally, the evidence demonstrated that there are strong public policy reasons against burying waste tires and that Elmo Greer was aware of these policies. Mr. Anderson testified that Elmo Greer was obligated to follow "state and federal regulations" and that the company would have been subject to penalties under its contract with the State had Elmo Greer been caught burying tires. Elmo Greer nonetheless buried the tires and subsequently showed no remorse for doing so. In fact, Elmo Greer proffered testimony from several witnesses that downplayed the significance of burying the tires. The public policy of this State, however, suggests that inappropriately burying even one waste tire is one too many, subjecting the violator to potentially significant financial penalties, i.e., up to $5,000 per day. *See* Tenn. Code Ann. § 68–211–117(a)(1). The record also indicates that properly disposing of the waste tires would have cost Elmo Greer money. The jury could have reasonably concluded that Elmo Greer intentionally buried the tires to avoid this expense. Viewing these circumstances as a whole, we have no difficulty finding that the record contains material evidence supporting the jury's finding by clear and convincing evidence that Elmo Greer acted intentionally or recklessly.

### B. Consideration of the State's Environmental Laws

■ Once a jury awards punitive damages, the trial court must review the award to ensure that the wrongdoer's conduct rose to the level where punitive damages are appropriate. *Hodges*, 833 S.W.2d at 902. The trial court thus reviews the evidence to consider whether the jury's findings are supported by clear and convincing evidence and whether the punitive award effectively punishes and deters the defendant from committing the same acts in the future. To guide trial courts in this review, we have identified a number of relevant factors:

(1) The defendant's financial affairs, financial condition, and net worth;

(2) The nature and reprehensibility of defendant's wrongdoing, for example

(A) the impact of defendant's conduct on the plaintiff, or

(B) The relationship of defendant to plaintiff;

(3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;

(4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;

(5) The expense plaintiff has borne in the attempt to recover the losses;

(6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;

(7) Whether, and the extent to which, defendant has been subjected to previous punitive damages awards based upon the same wrongful act;

(8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

*Hodges,* 833 S.W.2d at 901–02.

Analyzing these factors in great detail, the trial court concluded that clear and convincing evidence demonstrated that Elmo Greer intentionally buried the tires unearthed from the Goffs' land and that such behavior warranted a $1 million punitive damage award. In support of this conclusion, the trial court noted that the burying of tires was against the State's policy "to avoid pollution and the creation of unpermitted landfills," that the "State of Tennessee has a strong and legitimate interest in preventing construction companies . . . from dumping or polluting property located within the state," and that "[b]urying solid waste tires is a violation of [the] Tennessee Solid Waste Disposal Act." The Court of Appeals determined that be-cause the jury found that Elmo Greer had not committed an environmental tort, the trial court should not have relied on the State's environmental statutes and policies in affirming the award of punitive damages. Based on this finding, the Court of Appeals reversed the award of punitive damages and remanded the case to the trial court to reconsider the award based on the nuisance theory alone.

■ The Goffs assert that the trial court correctly considered the State's pollution statutes in affirming the punitive award because these laws and the policies they reflect are relevant in determining the reprehensibility of Elmo Greer's actions. The Goffs further assert that the trial court did not consider the environmental tort claim itself in reviewing the punitive award, but the facts supporting the nuisance claim. Elmo Greer responds that the trial court improperly based the punitive award upon an environmental tort theory that the jury rejected. Accordingly, Elmo Greer argues that the Court of Appeals properly corrected the trial court's error by remanding the case for reconsideration of the punitive award without regard to the State's environmental laws. We are persuaded that the Goffs have the better argument.

The evidence supporting the nuisance claim was the proof regarding buried whole waste tires. In order to determine the reprehensibility of burying whole waste tires, the trial court considered the State's policy regarding such action. To this end, the trial court correctly noted that the State has enacted legislation against burying whole waste tires, recited the public policy behind that legislation, acknowledged that Elmo Greer was aware of the State's policy against burying waste tires, and observed that high civil penalties are permissible for burying waste tires.

In our view, the fact that the legislature has determined it necessary to prevent the improper burial of tires "to protect the public health, safety and welfare" is important in the discussion of the reprehensibility of Elmo Greer's actions. *See* Tenn. Code Ann. § 68–211–102(a). Accordingly, we do not find that these assertions by the trial court implied that the jury found Elmo Greer liable for violating any of the state's Hazardous Waste Disposal Acts or that the trial court relied upon the environmental tort cause of action itself in reviewing the punitive award. Instead, we find that the trial court referenced the State's solid waste disposal laws to explain why the creation of a nuisance by burying whole waste tires was egregious enough to warrant punitive damages. Moreover, as noted above, the same facts supporting a violation of the Solid Waste Disposal Act can constitute a nuisance, as found by the jury in this case. *See Wayne County*, 756 S.W.2d at 283. We thus conclude that the trial court's consideration of statutes and policies against pollution and unauthorized landfills was legally permissible and factually appropriate.

## C. *Excessiveness of the Award/Due Process*

█ Having determined that the record contains evidence sufficient to award punitive damages and that the trial court did not err in referencing the State's environmental laws in reviewing the punitive award, we now must decide whether the size of the award violates Elmo Greer's due process rights under the Fourteenth Amendment to the United States Constitution. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 412, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); *Gore*, 517 U.S. at 562–63, 116 S.Ct. 1589; *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 7–8, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). When deciding whether a punitive damages award is excessive to the point that it transgresses constitutional due process standards, our review is de novo to ensure that the award is based on an application of the law rather than the jury's caprice. *Campbell*, 538 U.S. at 418, 123 S.Ct. 1513.

The United States Supreme Court squarely addressed for the first time whether a punitive damages award offended the Fourteenth Amendment in *Haslip*, 499 U.S. at 18, 111 S.Ct. 1032. In *Haslip*, the jury found the defendant liable for fraud and awarded compensatory damages in the amount of $200,000 together with punitive damages in the amount of $840,000. The Court began its analysis by reviewing the long-standing history of punitive awards, noting first that " '[p]unitive damages have long been a part of traditional state tort law,' " *id.* at 15, 111 S.Ct. 1032 (quoting *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 255, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)), and concluding that it "cannot say that the common-law method for assessing punitive damages is so inherently unfair as to deny due process and be *per se* unconstitutional," *id.* at 17, 111 S.Ct. 1032. The Court also acknowledged, however, that "[o]ne must concede that unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." *Id.* at 18, 111 S.Ct. 1032. Recognizing the difficulty in attempting to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable," the Court in *Haslip* emphasized that "general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus." *Id.* The Court then upheld the punitive award before it, holding as follows:

We are aware that the punitive damages award in this case is more than 4 times the amount of compensatory damages, is more than 200 times the out-of-pocket expenses of respondent Haslip, and, of course, is much in excess of the fine that could be imposed for insurance fraud under [Alabama law]. Imprisonment, however, could also be required of an individual in the criminal context. While the monetary comparisons are wide and, indeed, may be close to the line, the award here did not lack objective criteria. We conclude, after careful consideration, that in this case it does not cross the line into the area of constitutional impropriety.

*Id.* at 23–24, 111 S.Ct. 1032 (citations omitted).

Several years later, again considering a due process challenge to punitive damages, the Court made clear that "notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *Gore,* 517 U.S. at 574, 116 S.Ct. 1589. And, although the Court has emphasized that punitive damages are "aimed at deterrence and retribution," *Campbell,* 538 U.S. at 416, 123 S.Ct. 1513, and that a jury's "imposition of punitive damages is an expression of its moral condemnation," *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), it has also warned that "[t]o the extent an award [of punitive damages] is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Campbell,* 538 U.S. at 417, 123 S.Ct. 1513. To assist courts in determining whether a punitive award is grossly excessive and violates due process, the Court has identified three guideposts: (1) the degree of reprehensibility of the defen-dant's conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. *Gore,* 517 U.S. at 574–75, 116 S.Ct. 1589. We will consider the application of each of these guideposts to the punitive damages awarded in this case.

### (1) Reprehensibility of the Conduct

The first of the three guideposts is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Gore,* 517 U.S. at 575, 116 S.Ct. 1589. Citing factors similar to those set forth in *Hodges,* the Supreme Court has explained that "some wrongs are more blameworthy than others," *id.,* including "trickery and deceit," *id.* at 576, 116 S.Ct. 1589 (quoting *TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 462, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)). And while the Court has indicated that purely economic harm may be less reprehensible than harm involving health and safety, it has also indicated that "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty." *Id.* at 576, 116 S.Ct. 1589 (citation omitted). The Supreme Court has also observed that, when addressing the reprehensible nature of a defendant's conduct, courts should consider whether

the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of

intentional malice, trickery, or deceit, or mere accident.

*Campbell,* 538 U.S. at 419, 123 S.Ct. 1513.

■ Applying these factors to the instant case, we find Elmo Greer's actions objectionable in several significant ways. First, Elmo Greer intentionally buried tires on the Goffs' property. Elmo Greer engaged in this deliberate conduct despite its repeated assurances to Mr. Goff "not to worry about it" and "we'll clean it up," and despite Mr. Goff's specific request that the tires not be buried. Second, this intentional conduct included an effort by Elmo Greer to hide its deliberate misdeeds because Elmo Greer buried the tires under large, heavy limestone rocks—some as large as a pick-up truck—eight or nine feet underground. The Goffs were helpless to discover the tires without hiring excavation experts at their own expense. Third, because Mr. Anderson testified that there is a cost associated with properly disposing of tires, it appears that Elmo Greer buried them to avoid having to pay these expenses.[12] Fourth, Elmo Greer knew that its conduct was not only in violation of its contract with the Goffs, but was illegal as well, for Mr. Anderson admitted to being aware of State law regarding the disposal of tires. He also knew that Elmo Greer would have faced heavy penalties had the company been caught burying tires. Fifth, Elmo Greer's conduct violated clearly expressed public policies regarding pollution and unauthorized landfills. The legislature has clearly set forth the public

policy behind the State's solid waste disposal laws:

In order to protect the public health, safety and welfare, prevent the spread of disease and creation of nuisances, conserve our natural resources, enhance the beauty and quality of our environment and provide a coordinated statewide solid waste disposal program, it is declared to be the public policy of the state of Tennessee to regulate solid waste disposal to:

(1) Provide for safe and sanitary processing and disposal of solid wastes;

(2) Develop long-range plans for adequate solid waste disposal systems to meet future demands; [and]

(3) Provide a coordinated statewide program of control of solid waste processing and disposal in cooperation with federal, state, and local agencies responsible for the prevention, control, or abatement of air, water, and land pollution.

Tenn.Code Ann. § 68–211–102(a).[13] The legislature has also noted the important state interest of "educat[ing] and encourag[ing] generators and handlers of solid waste to reduce and minimize to the greatest extent possible the amount of solid waste which requires collection, treatment, incineration or disposal through source reduction, reuse, composting, recycling and other methods." *Id.* § 68–211–803(b). Despite being aware of these policies, Elmo Greer elected to ignore them.

Elmo Greer's conduct was exacerbated by its refusal to accept responsibility for its actions. Mr. Anderson conditioned the

---

**12.** The trial court observed that Elmo Greer "knew how large tires were required to be cut up and shredded and then disposed of in an approved site. It is difficult to determine the defendant's motivation. Was it convenience? Was it laziness? Was it 'we won't get caught'? Was it to save money and increase profit? Whatever the motivation, it was not admirable."

**13.** Like the trial court, we reference relevant portions of the Solid Waste Disposal Act to explain why burying tires constitutes reprehensible conduct, though we realize that the jury did not find Elmo Greer liable for creating an "environmental hazard."

company's apology by stating that *"[i]f Elmo Greer had something to do with [the tires], [it was] sorry."* (Emphasis added). Elmo Greer's witnesses downplayed the significance of the concealed tires. This testimony, in our opinion, does not demonstrate much accountability or remorse— important factors in evaluating the likelihood that a tortfeasor will repeat its tortious conduct. Instead, it suggests that Elmo Greer operates with the mind-set that burying tires in violation of the law and in breach of contractual obligations is simply "no big deal."

These multiple aspects of Elmo Greer's conduct are indicative of bad faith. *See Gore,* 517 U.S. at 579, 116 S.Ct. 1589 (invalidating a punitive damage award in part because the record disclosed "no deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive"). Moreover, they indicate that Elmo Greer was willing to deliberately harm not only the Goffs, but willing to place others potentially at risk by essentially creating an unauthorized landfill. Elmo Greer's disregard for the public interest is all the more troubling in light of the fact that it was acting as a contractor for the State of Tennessee. Elmo Greer did nothing to alleviate the situation its indifference had created, but rather chose to hide and trivialize it.

At the same time, consistent with the testimony presented, the jury found that Elmo Greer did not create an environmental hazard to the Goff property. The expert testimony was clear that there is little likelihood that environmentally dangerous or other hazardous chemicals have been spilled onto the land or into the water supply. The Tennessee Department of Environment and Conservation was made aware of the situation but declined to assess any penalties because it did not find any long term health or safety risks to exist on this property.

Thus, although Elmo Greer's conduct was sufficiently reprehensible for this guidepost to point toward a substantial punitive damages award, it did not rise to the highest level of reprehensibility.

### (2) Disparity Between the Harm and the Award

The second guidepost is the "disparity between the harm or potential harm suffered" and the punitive damages awarded. *Gore,* 517 U.S. at 575, 116 S.Ct. 1589. This guidepost reflects the general concern that punitive damages bear a "reasonable relationship" to compensatory damages. *Id.* at 580, 116 S.Ct. 1589. According to the Supreme Court, "the proper inquiry is whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred." *Id.* at 581, 116 S.Ct. 1589(internal quotation marks and citation omitted). Although the Court has repeatedly refused to "impose a bright-line ratio which a punitive damages award cannot exceed," the Court has also stated that "few awards exceeding a single-digit ratio between punitive and compensatory damages … will satisfy due process." *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513. *See also Gore,* 517 U.S. at 582–83, 116 S.Ct. 1589 ("Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula…."). Moreover, the Supreme Court has made clear that "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff," and that "there are no rigid benchmarks that a punitive damages award may not surpass." *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513.[14] We agree.

14. Although the Supreme Court has not adopted a bright-line rule to be applied, it did

The Supreme Court has acknowledged that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Gore*, 517 U.S. at 582, 116 S.Ct. 1589. "A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id.*[15] However, the Court has described as "breathtaking" a 500–to–1 ratio between punitive and compensatory awards. *Id.* at 583, 116 S.Ct. 1589.

In this case, Elmo Greer asserts that a $1 million punitive damage award is excessive because it exceeds the compensatory award by a ratio of 302 to 1. Thus we must analyze the Supreme Court's cases dealing with punitive damages in greater detail to determine whether focusing only on the ratio, and insisting that only single-digit ratios are constitutional, reflects an overly restrictive view that does not comport with the Supreme Court's jurisprudence on the subject.

In *TXO Production Corp.*, 509 U.S. at 453, 113 S.Ct. 2711, the Supreme Court affirmed a punitive damage award that was 526 times as great as the compensatory damages. In that case, TXO contracted to purchase the oil and gas rights on a tract of land owned by Alliance. TXO subsequently manufactured a claim that title to the property was defective and attempted to renegotiate its deal with Alliance. When the negotiations were unsuccessful, TXO sought a declaratory judgment to remove the purported defect. Alliance counterclaimed for slander of title and was awarded $19,000 in actual damages and $10 million in punitive damages. In affirming the award, the Supreme Court observed that it "is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." *Id.* at 460, 113 S.Ct. 2711. The Court then held that it did

not consider the dramatic disparity between the actual damages and the punitive award controlling in a case of this character. On this record, the jury may reasonably have determined that petitioner set out on a malicious and fraudulent course to win back, either in whole or in part, the lucrative stream of royalties that it had ceded to Alliance. The punitive damages award in this case is

impose a specific 1–to–1 ratio of punitive damages to compensatory damages in *Exxon Shipping Co. v. Baker*, — U.S. —, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008). In that case, following the wreck of the *Exxon Valdez* and the resulting oil spill in Alaska, compensatory damages were assessed against Exxon in the amount of $507.5 million, plus punitive damages of $5 billion. After noting that the case "differs from due process review because the case arises under federal maritime jurisdiction, and we are reviewing a jury award for conformity with maritime law, rather than the outer limit allowed by due process," the Court determined that a 1–to–1 ratio of punitive damages to compensatory damages "is a

fair upper limit in such maritime cases." *Id.* at 2626, 2633. The Court therefore remitted the punitive damages award to $507.5 million.

**15.** We note that some federal courts have suggested that in cases where nominal damages are awarded, the ratio inquiry can be largely disregarded. *See, e.g., Abner v. Kansas City S. R.R.*, 513 F.3d 154, 165 (5th Cir.2008); *Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142, 154–55 (4th Cir.2008). Although the compensatory award of $3,305 in this case is not nominal, it is low enough that we consider the ratio guidepost with caution.

certainly large, but in light of the amount of money potentially at stake, the bad faith of petitioner, the fact that the scheme employed in this case was part of a larger pattern of fraud, trickery and deceit, and petitioner's wealth, we are not persuaded that the award was so "grossly excessive" as to be beyond the power of the State to allow. *Id.* at 462, 113 S.Ct. 2711 (footnote omitted).

Other courts have been willing to affirm ratios exceeding single digits when the compensatory damages were relatively low but the actions of the wrongdoer were egregious. For example, in *Saunders v. Branch Banking & Trust Co. of Virginia,* 526 F.3d 142, 154–55 (4th Cir.2008), the Fourth Circuit affirmed an 80–to–1 ratio in a case involving violations of the Fair Credit Reporting Act. In *Abner v. Kansas City Southern Railroad,* 513 F.3d 154, 165 (5th Cir.2008), the Fifth Circuit affirmed a 125,000–to–1 ratio in a case involving a race-based hostile work environment. In *Kemp v. American Telephone & Telegraph Co.,* 393 F.3d 1354, 1365 (11th Cir.2004), the Eleventh Circuit imposed a punitive award of $250,000 accompanying compensatory damages of only $115.05, a ratio of 2,173 to 1. In *Mathias v. Accor Economy Lodging, Inc.,* 347 F.3d 672, 678 (7th Cir. 2003), the Seventh Circuit upheld a 37.2–to–1 ratio in a case involving bedbugs at a motel. In *Lynn v. TNT Logistics North America Inc.,* 275 S.W.3d 304, 312 (Mo.Ct. App.2008), the court imposed in a sexual harassment case a punitive award equivalent to a 75–to–1 ratio. In *Jones v. Rent–A–Center, Inc.,* 281 F.Supp.2d 1277, 1290 (D.Kan.2003), the court upheld a 29–to–1 ratio in a sexual harassment case. These cases reflect the principle that "there are no rigid benchmarks that a punitive damages award may not surpass," but instead "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513.

▉ In this case, the ratio of $1 million punitive damages to compensatory damages as approved by the trial judge is over 302 to 1. This ratio is excessive in light of the circumstances presented. As set forth above, Elmo Greer buried tires which, while constituting a nuisance, do not constitute an environmental hazard or threaten the health or safety of any individual.

Before leaving this point, however, we note that the jury heard proof that the cost to plaintiffs to clean up the entire property, to ensure that no other impermissible waste materials are buried on their property, would be $318,000. Although the jury rejected the notion that this amount was the required measure of damages, it highlights the problem that the monetary value of noneconomic harm is sometimes difficult to determine, thus justifying a higher ratio. *Gore,* 517 U.S. at 583, 116 S.Ct. 1589.

### (3) Difference between Punitive Damages and Other Penalties

▉ The third and final guidepost requires courts to compare the punitive damage award to civil or criminal penalties authorized or imposed in comparable cases. *Gore,* 517 U.S. at 583, 116 S.Ct. 1589. The Supreme Court has instructed that in determining whether the award is excessive, courts should give " ' "substantial deference" ' " to legislative judgments concerning appropriate sanctions for the conduct at issue.' " *Id.* at 583, 116 S.Ct. 1589 (quoting *Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 301, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (O'Connor, J., concurring in part and dissenting in part)). Penalties that could be imposed for similar conduct "are

relevant because they provide defendants with notice of the severity of the penalty that may be imposed upon them." *Flax,* 272 S.W.3d at 537. We also note that at least one court has observed that "when the punitive damages are compared to the civil or criminal penalties that could be imposed for comparable conduct, the ratio of punitive damages to compensatory damages becomes less significant." *Bronakowski v. Lindhurst,* —— S.W.3d ——, —— (Ark.Ct.App.2009).

In this case, we are readily able to determine the amount of civil penalties that may be assessed for the improper disposal of waste tires. Tennessee Code Annotated section 68–211–117(a)(1) provides for "a civil penalty of not less than one hundred dollars ($100) nor more than five thousand dollars ($5,000) per day for each day of violation [of the Solid Waste Disposal Act]." The tires Elmo Greer buried on the Goffs' property remained there for approximately seven years, or roughly 2,500 days. Accordingly, Elmo Greer could have faced civil penalties ranging from $250,000 to $12.5 million.[16] Thus, the $1 million punitive award imposed upon Elmo Greer is within the civil fine range authorized by the legislature.[17] However, Johnny Michael Apple, Director of Solid Waste Management for the Tennessee Department of Environment and Conservation, testified that no fines had been or would be imposed on Elmo Greer for this violation and that no further investigation of this property was needed. Given the apparent disparity between the sanctions authorized by the legislature and the sanctions that would, in practice, be imposed, we cannot conclude that this guidepost either supports or undermines the punitive damages awarded.

In short, we have carefully considered the application of the three guideposts to the punitive damages awarded in this case. After doing so we are constrained to acknowledge that the punitive award approved by the trial court is too large given the circumstances and does violate Elmo Greer's due process rights. We conclude that the award must be modified to $500,000. This award sends a strong message about the serious nature of Elmo Greer's misconduct. At the same time, however, it is more rationally related to the non-physical harm suffered in this case.

## D. Punitive Damages Jury Instructions

Elmo Greer asserts that the trial court erred by instructing the jury that intentional or reckless conduct can form the basis for punitive damages because the Goffs pled only intentional and fraudulent misconduct. Elmo Greer further claims that the trial court erred in failing to instruct the jury that punitive damages are proper only in egregious circumstances. *See Hodges,* 833 S.W.2d at 901 ("We agree with those States that have refined their laws to restrict the awarding of punitive damages to cases involving only the most egregious of wrongs."). In considering this issue, we note that Tennessee law is clear that a jury charge should be reviewed in its entirety and considered as a whole when determining whether the trial court committed prejudicial error. *Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439,

---

**16.** Persons violating the Solid Waste Disposal Act may also be found guilty of a Class B misdemeanor for each day of violation. *See* Tenn.Code Ann. § 68–211–114.

**17.** The Goffs point out that the award is also less than 2% of Elmo Greer's net worth for 2003, though they recognize that a defendant's wealth "cannot justify an otherwise unconstitutional punitive damages award." *Campbell,* 538 U.S. at 427, 123 S.Ct. 1513.

446 (Tenn.1992). "The charge will not be invalidated as long as it fairly defines the legal issues involved in the case and does not mislead the jury." *Id.*

 Regarding the trial court's failure to include the word "egregious" in the charge, we find no error. While it is true that this precise word was not included in the charge, it is also true that Tennessee Pattern Instruction—Civil 14.55, which covers the subject of punitive damages, was incorporated in its entirety into the charge. In our view, the charge as given complied with the essentials of *Hodges.* Although juries must be made aware that punitive damages are reserved for cases involving more than mere negligence, specifically those cases involving intentional, fraudulent, reckless, or malicious conduct, *Hodges,* 833 S.W.2d at 901, we find that the trial court fairly defined the legal principles of punitive damages and in no way misled the jury. Further, as requested by Elmo Greer, the question posed on the verdict form did contain the word "egregious."[18] We hasten to add, however, that in the interest of clarity trial courts would do well to explicitly charge that punitive damages are reserved for egregious conduct as a way of crystalizing the point that punitive damages do indeed represent "strong medicine." *Gore,* 517 U.S. at 577, 116 S.Ct. 1589. We do not believe, however, that the lack of such specificity in this particular case amounts to reversible error.

 Regarding the trial court's inclusion of the word "reckless" in the charge, we also find no error. Placing substance over form, Tennessee law recognizes that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Tenn. R. Civ. P. 15.02. Determining whether an issue was tried by implied consent rests with the discretion of the trial judge whose determination will be reversed only upon a finding of abuse. *Zack Cheek Builders, Inc. v. McLeod,* 597 S.W.2d 888, 891 (Tenn.1980).

 Here, the trial court instructed that punitive damages "may be considered if, and only if, the plaintiff has shown by clear and convincing evidence that a defendant has acted either intentionally or recklessly." Elmo Greer asserts that because the Goffs did not plead "reckless," it should not have been included in the instruction. We disagree. At trial, Elmo Greer's attorney stated to the jury that "Elmo Greer is being sued for lots of money to punish us for punitive damages because the Goff's [sic] claim that we intentionally or deliberately or *recklessly* caused contamination on their property." (Emphasis added). Further, at the conclusion of the Goffs' proof, Elmo Greer moved to dismiss, stating that the evidence "just doesn't show the kind of malicious, *reckless* kind of conduct that *Hodges* requires." (Emphasis added). During closing arguments, Elmo Greer's attorney stated that (1) "[i]t is not a charge to be taken lightly because they are saying we purposefully or *recklessly* put items into the fill [area]," (2) "[y]ou can't stay in business if you are in the business of going out and doing intentional or *reckless* acts," and (3) Elmo Greer "didn't act *recklessly.*" (Emphasis added).

---

18. The question submitted by Elmo Greer in its proposed special verdict form was, "Have the plaintiffs proved by clear and convincing evidence that Greer and Sons Construction Company is guilty of such egregious and intentional, and/or fraudulent acts that an award of punitive damages should be assessed against the defendant as punishment for these actions?" The question as posed by the trial court was identical, except that "or reckless" was substituted for "and/or fraudulent." *See* footnote 11, *supra.*

In light of these circumstances, we conclude that the trial court was within its discretion to determine that the parties impliedly consented to try assertions that Elmo Greer's reckless actions warranted punitive damages and, further, that the evidence supported the inclusion of instructions to the jury on reckless behavior.

## III. Motion for Mistrial

During his testimony, Mr. Goff began to speak about his preparation for Elmo Greer of an estimate of the damages he had sustained. His attorney handed to him a document, which was a letter he sent to Elmo Greer's insurance adjusting company detailing the damage to his house and vehicles caused by Elmo Greer's blasting activities. Prior to Mr. Goff identifying or reading the letter, Elmo Greer's counsel said to the court, "We need to have a discussion about that." Counsel then approached the bench and, outside the hearing of the jury and not contained in the record, had a conversation about the letter. At the conclusion of the conference, Mr. Goff's counsel resumed questioning his client with the instruction not to identify the recipient of the letter. After a few more questions, counsel for Elmo Greer again asked for a bench conference, the contents of which are not in the record. Thereafter, the trial judge and counsel continued their conversation in the jury's presence, discussing the need for additional redactions before the document could be admitted as an exhibit. No party, witness, or attorney ever mentioned "insurance." Suddenly, and sua sponte, the trial judge said to the jury:

> Well, you jurors are . . . wondering what in the world is this judge trying to keep from us. Well, I might as well just tell you. It's improper and inappropriate for a jury to even consider or discuss or even think about the fact that somebody might have insurance. So, it would be improper for you, at any time during this trial or during your deliberations, to discuss or consider or think about or anything else with regard to whether somebody did have or didn't have insurance. So, don't you worry about that and it would be a violation of your oath as a juror to discuss that or let that influence you in any way, one way or the other. The damages are what the damages are. If there's liability, there's liability. If there's not, then insurance hasn't got a thing in the world to do with it, okay? You follow that instruction.

Mr. Goff then read the approved portions of the letter to the jury. Elmo Greer later moved for a mistrial, asserting that the trial court's instruction to the jury not to consider insurance was the equivalent of instructing the jury that insurance was involved and that the parties had tried to settle the case. The trial court denied the motion. Elmo Greer asserts that the trial court's mention of insurance during the trial prejudiced the company as evidenced by the jury awarding minimal compensatory damages but substantial punitive damages.

Evidence concerning the existence of insurance is generally inadmissible at trial. Tenn. R. Evid. 411 ("Evidence that a person was or was not insured against liability is not admissible upon issues of negligence or other wrongful conduct."). The injection of insurance during trial, however, does not necessarily warrant a mistrial, *Seals v. Sharp*, 31 Tenn. App. 75, 212 S.W.2d 620, 623 (1948), but may when the reference to insurance was made willfully for the purpose of influencing the jury, *see Terry v. Plateau Elec. Co-op.*, 825 S.W.2d 418, 422–23 (Tenn.Ct.App. 1991). In the absence of such willful injection, a curative instruction to the jury not to consider insurance will suffice because juries are presumed to follow the court's

instructions. *See CSX Transp., Inc. v. Hensley,* — U.S. ——, 129 S.Ct. 2139, 2141, 173 L.Ed.2d 1184 (2009) ("as in all cases, juries are presumed to follow the court's instructions").

 In this case, there is nothing in the record to suggest that any of the participants in the trial willfully (or at all) referred to insurance in an attempt to influence the jury. *See McClard v. Reid,* 190 Tenn. 337, 229 S.W.2d 505, 506 (1950) ("[I]t is more or less a question for the trial court, to exercise his discretion on, as to whether or not the plaintiff has deliberately injected the insurance question to the prejudice of the defendant."). It was the trial judge himself who sua sponte mentioned insurance. Moreover, the trial court then specifically informed the jury that insurance was not to be considered at any point during the trial or deliberations. Accordingly, while we caution trial judges against raising matters that cannot be introduced by the parties, we do not find that the trial court abused its discretion in denying Elmo Greer's motion for a mistrial. *See Hunter v. Ura,* 163 S.W.3d 686, 699 (Tenn.2005) ("Whether to grant a mistrial is a decision left to the discretion of the trial court.").

### Conclusion

For the foregoing reasons, we conclude that the evidence supports the award of punitive damages and that the trial court did not err in considering the State's environmental laws in approving the punitive award. We further conclude that the amount of the punitive damages award is excessive and does violate Elmo Greer's due process rights. We therefore modify the amount of punitive damages awarded to the Goffs to $500,000. We also find no error in the trial court's instructions to the jury regarding punitive damages. Finally, we hold that the trial court did not abuse its discretion in denying Elmo Greer's motion for a mistrial based on the mention of insurance at trial. Accordingly, the decision of the Court of Appeals is reversed and the judgment of the trial court is reinstated as modified. The costs of this appeal are taxed to Elmo Greer & Sons Construction Company and its surety, for which execution may issue if necessary.