IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 20, 2014 Session

## NATHAN B. OVERTON ET AL. v. WESTGATE RESORTS, LTD., L.P. ET AL.

**Appeal from the Chancery Court for Sevier County**
**No. 12-6-294    Telford E. Forgety, Jr.,  Chancellor**

_____

**No. E2014-00303-COA-R3-CV-FILED-JANUARY 30, 2015**

_____

This case involves the propriety of an award of punitive damages in the amount of $600,000. The plaintiffs sued the defendant timeshare developer, seeking to rescind a contract for purchase of a timeshare interest. The plaintiffs alleged, *inter alia*, that the defendant was guilty of fraud and misrepresentation, as well as violations of the Tennessee Time-share Act and the Tennessee Consumer Protection Act. Following the hearing, the trial court ruled in favor of the plaintiffs and allowed them to rescind the contract, ordering repayment of their purchase money. The trial court found that the defendant had violated the respective statutory provisions and was guilty of fraud and misrepresentation. The trial court thus determined that an award of punitive damages was proper, and following a second hearing regarding the amount of the punitive damage award, set such award at $600,000. The defendant has appealed this award. While we affirm the determination of the trial court that $600,000 represents a reasonable award of punitive damages considering all applicable factors, we must order remittitur of that award to $500,000 in accordance with the statutory cap found in Tennessee Code Annotated § 29-39-104(a)(5).

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed as Modified; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Gregory C. Logue and Robert L. Vance, Knoxville, Tennessee, for the appellant, Westgate Resorts, Ltd., L.P.

John O. Belcher and Curtis R. Harrington, Nashville, Tennessee, for the appellees,

Nathan B. Overton and Patricia A. Overton.


**OPINION**

I.  Factual and Procedural Background

The plaintiffs, Nathan and Patricia Overton, filed the instant action against Westgate Resorts, Ltd., L.P. ("Westgate"), seeking to rescind a contract for purchase of a timeshare interest at the Westgate Resort in Gatlinburg.[1]  The Overtons alleged fraud, misrepresentation, breach of contract, and violations of the Tennessee Time-share Act, Tennessee Code Annotated § 66-32-101, *et seq*., and the Tennessee Consumer Protection Act, Tennessee Code Annotated § 47-18-101, *et seq*.  The Overtons also sought awards of compensatory damages, enhanced or punitive damages, and attorney's fees.

At trial, the Overtons testified that they traveled to Gatlinburg in July 2011 to search for a cabin or timeshare to purchase for family vacations.  The Overtons desired to purchase a property or timeshare with sufficient space to accommodate their extended family for a trip every December to celebrate Christmas and their wedding anniversary.  While walking in downtown Gatlinburg on the morning of July 12, 2011, Ms. Overton happened upon a Westgate booth.  She was told that she and her husband could attend a ninety-minute presentation regarding the purchase of a timeshare and that they would receive certain gifts in return.

Ms. Overton shared this information with her husband, and the Overtons decided to attend the presentation.  They traveled to the Westgate Resort in Gatlinburg, where they were met by Robert Brian Justice, a Westgate salesperson.  Mr. Justice provided them with information about the resort and accompanied them to tour different timeshare units.  At some point, Raymond Veverka, a Westgate sales manager, joined the Overtons and Mr. Justice to discuss purchase prices for the units.  The Overtons described their dealings with Mr. Justice and Mr. Veverka as "high pressure," with the Overtons spending a total of almost eight hours in discussions with the salespersons on that day.

During the presentation, the Overtons found a suitable unit that would accommodate the needs of their extended family.  It was described as Unit 458.  Satisfied with their choice, the Overtons decided to purchase a Westgate timeshare interest for a purchase price of $39,280.  According to the Overtons, their decision to purchase was based on certain assurances from the salespersons that (1) the Overtons would be able to

---

[1] Plaintiffs also named Westgate salespersons, Raymond Veverka and Robert Brian Justice, as defendants; however, Mr. Veverka and Mr. Justice are not parties to this appeal.

request and obtain a reservation for Unit 458 for the same week in December each year; (2) the Overtons would have the right to book unlimited additional nights at any Westgate resort for $49 to $69 per night ("Owners' Nights"); (3) Mr. Justice and Mr. Veverka would personally refund part of their commissions on the sale to the Overtons, in the amounts of $1,000 and $500 respectively; and (4) Mr. Justice and Mr. Veverka would purchase a foosball table that would be kept at the resort for the Overtons' use during their stays there.

The promises regarding the foosball table and the commission refunds were put in writing and signed by the salespersons. The alleged promises regarding unlimited Owners' Nights and the guaranteed use of Unit 458 every December, however, were not made a part of any written documentation. Rather, the documents signed by the Overtons at the closing, which took place at approximately 11:00 p.m. that evening, specifically state that the timeshare interest is for a "floating" week and unit. Following the closing, the Overtons were presented with a briefcase containing copies of all of their closing documents as well as three CD-ROM discs.

Following their departure from the Westgate Resort in Gatlinburg, the Overtons traveled home to Dickson, Tennessee, expecting a call from Mr. Veverka the next day to confirm their reservation for Unit 458 for December 2011. The call did not come. When the Overtons were able to reach Mr. Veverka by telephone a few days later, he reportedly assured them that their reservation for Unit 458 was complete. According to the Overtons, when they subsequently tried to confirm their reservation with the individual whom Mr. Veverka had instructed them to contact, they were informed that there existed no guarantee of booking Unit 458 and that units were not assigned more than a few days in advance of arrival.

The Overtons attempted to contact Westgate customer service, speaking to various individuals about this purported misrepresentation. Through the course of numerous phone calls, the Overtons were informed that they did not have unlimited Owners' Nights and could not be guaranteed the use of the week or unit they preferred from year to year. The Overtons in turn contacted counsel, who reviewed the documents and CD-ROMs provided to the Overtons at closing. During this review, it was discovered that the Overtons had not been provided with a current and complete copy of Westgate's public offering statement ("POS") as required by Tennessee Code Annotated § 66-32-112 and -114, relevant sections of the Tennessee Time-share Act. Rather, the Overtons had been provided with CD-ROMs that, upon further analysis by a computer expert, were determined to contain only a POS from 2006 and other files with illegible pages. The CD-ROMs were also nearly impossible to navigate without the required serial number, which had not been explained to the Overtons. Consequently, pursuant to Tennessee Code Annotated § 66-32-114, the Overtons sought to rescind the contract. Written notice

3

of their request to rescind was sent to Westgate's corporate office in Florida on October 25, 2011.

Counsel for Westgate sent a response on November 28, 2011, denying the Overtons' request to rescind the contract. The Overtons subsequently filed the instant action. Following a trial conducted on June 19 and 20, 2013, the court ruled in favor of the Overtons. Finding that the Overtons were never provided a correct and current POS by Westgate, the trial court granted a rescission of the contract, ordering Westgate to refund the Overtons' purchase money. The trial court further determined that Westgate intentionally failed to provide the Overtons with an accurate POS and intentionally refused to rescind the contract "despite overwhelming evidence" that rescission was justified.

Regarding additional claims presented by the Overtons, the court found that the Overtons were promised gifts of a foosball table and unlimited Owners' Nights without proper disclosure in violation of Tennessee Code Annotated § 66-32-133. These violations of the Tennessee Time-share Act were determined to be willful. The court further found that Westgate had engaged in deceptive practices in violation of the Tennessee Consumer Protection Act, specifically Tennessee Code Annotated § 47-18-104, and that Westgate was guilty of common law fraud and misrepresentation with regard to the promise of unlimited Owners' Nights. The court specifically found that Westgate trained its salespersons to make such a promise and knew that its salespersons were representing that such a program existed even though the written documents did not mention it.

With respect to the relief granted, the trial court ruled that the Overtons were entitled to punitive damages for common law fraud and/or misrepresentation, as well as enhanced statutory damages and attorney's fees pursuant to the Tennessee Consumer Protection Act. A future hearing date for determination of the amount of punitive damages, enhanced damages, and attorney's fees was established. The court concluded that the Overtons would be allowed to elect between the punitive or enhanced damages once the amounts had been established.

The hearing was conducted on October 21, 2013, with the parties presenting information regarding Westgate's financial status. Following the hearing, the trial court issued a memorandum opinion, reiterating that the Overtons had established their entitlement to punitive damages by clear and convincing evidence. The court explained that although punitive damages were designed to punish the wrongdoer, they should not run afoul of constitutional considerations such as reprehensibility of conduct, disparity between the punitive damage award and the losses incurred by the plaintiffs, and the difference between the punitive damage award and statutory damages. The trial court

carefully reviewed the application of the nine factors discussed in *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901-902 (Tenn. 1992).

Upon consideration of all applicable factors, the trial court established the punitive damage award at $600,000, finding the most significant factors to be Westgate's financial position and the reprehensibility of its conduct. The enhanced statutory damages were set at $113,340, which represented the amount of compensatory damages trebled. The Overtons elected to receive the $600,000 punitive damage award. They were also awarded $117,082 in attorney's fees and $19,198 in litigation expenses.

Westgate filed a motion to alter or amend the judgment, which was subsequently denied by the trial court. The Overtons filed a motion seeking additional attorney's fees, which the trial court granted in the amount of $25,429. Westgate timely appealed.

## II. Issues

Westgate presents the following issues for our review, which we have restated slightly:

1. Whether the trial court erred in ruling that the Overtons were entitled to punitive damages based on clear and convincing evidence that Westgate acted maliciously, intentionally, fraudulently, or recklessly.

2. Whether the trial court erred in awarding the Overtons $600,000 in punitive damages.

3. Whether the trial court erred in ruling that Westgate willfully violated the Tennessee Time-share Act and the Tennessee Consumer Protection Act.

4. Whether the trial court erred in failing to enforce the forum selection provision contained in the contract.

The Overtons raise the following additional issue:

5. Whether the Overtons should receive an additional award of attorney's fees on appeal pursuant to the Tennessee Time-share Act and the Tennessee Consumer Protection Act.

### III. Standard of Review

Our standard of review is *de novo* with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *McCarty v. McCarty*, 863 S.W.2d 716, 719 (Tenn. Ct. App. 1992). No presumption of correctness attaches to the trial court's legal conclusions. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

As this Court has previously explained, the question of whether the record demonstrates clear and convincing evidence to support the trial court's decision to award punitive damages is a question of law, reviewed on appeal by applying the following standard:

> Under [the clear and convincing] standard of proof, the appellate court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." The facts as found by the trial court are reviewed *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. Findings of fact based on witness credibility are given great deference and will not be disturbed absent clear evidence to the contrary. Whether the combined weight of the facts, either as found by the trial court or supported by a preponderance of the evidence, establish clearly and convincingly that [punitive damages are warranted] is a question of law, subject to *de novo* review with no presumption of correctness.

*White v. Empire Exp., Inc.*, 395 S.W.3d 696, 721 (Tenn. Ct. App. 2012) (quoting *In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011)).

### IV. Westgate's Liability for Award of Punitive Damages

Westgate contends that the trial court erred in its determination that an award of punitive damages was warranted. As Westgate points out, punitive damages are available in Tennessee if the trial court finds that a defendant has acted (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly. *See Hodges*, 833 S.W.2d at 901. Further, the Tennessee Time-share Act provides that a timeshare developer may be subjected to a punitive damages award for a willful violation of the Act. *See* Tenn. Code Ann. § 66-32-118 (2004).

In the instant action, the trial court found that Westgate acted both intentionally and fraudulently. As our Supreme Court has explained:

A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation.

*Hodges*, 833 S.W.2d at 901 (internal citations omitted). The trial court also found that Westgate willfully violated the Tennessee Time-share Act by failing to provide the Overtons with a current and complete POS.

In relevant portion, the Tennessee Time-share Act requires:

A public offering statement must be provided to each purchaser of a time-share interval and must contain or fully and accurately disclose:

> (1) The name of the developer and the principal address of the developer and the time-share intervals offered in the statement;
>
> (2) A general description of the units including, without limitation, the developer's schedule of commencement and completion of all buildings, units, and amenities or if completed that they have been completed;
>
> (3) As to all units offered by the developer in the same time-share project:
>
>> (A) The types and number of units;
>>
>> (B) Identification of units that are subject to time-share intervals; and
>>
>> (C) The estimated number of units that may become subject to time-share intervals;
>
> (4) A brief description of the project;
>
> (5) If applicable, any current budget and a projected budget for the time-share intervals for one (1) year after the date of the first transfer to a purchaser. The budget must include,

7

without limitation:

(A) A statement of the amount, or a statement that there is no amount, included in the budget as a reserve for repairs and replacement;

(B) The projected common expense liability, if any, by category of expenditures for the time-share intervals;

(C) The projected common expense liability for all time-share intervals; and

(D) A statement of any services not reflected in the budget that the developer provides, or expenses that it pays;

(6) Any initial or special fee due from the purchaser at closing, together with a description of the purpose and method of calculating the fee;

(7) A description of any liens, defects, or encumbrances on or affecting the title to the time-share interval;

(8) A description of any financing offered by the developer;

(9) A statement that within ten (10) days from the date of the signing of the contract made by the purchaser, where the purchaser shall have made an on-site inspection of the time-share project prior to the signing of the contract of purchase, and where the purchaser has not made an on-site inspection of the time-share project prior to the signing of the contract of purchase fifteen (15) days from the date of signing of the contract, the purchaser may cancel any contract for the purchase of a time-share interval from developer;

(10) A statement of any pending suits material to the time-share intervals of which a developer has actual knowledge;

(11) Any restraints on alienation of any number of portion of any time-share intervals;

(12) A description of the insurance coverage, or a statement that there is no insurance coverage, provided for the benefit of time-share interval owners;

(13) Any current or expected fees or charges to be paid by time-share interval owners for the use of any facilities related to the property;

(14) The extent to which financial arrangements have been provided for completion of all promised improvements; and

(15) The extent to which a time-share unit may become subject to a tax or other lien arising out of claims against other owners of the same unit.

Tenn. Code Ann. § 66-32-112 (2004). The Act further provides:

"[b]efore transfer of a time-share interval and no later than the date of any sales contract, the developer shall provide the intended transferee with a copy of the public offering statement and any amendments and supplements thereto. The contract is voidable by the purchaser until the purchaser has received the public offering statement."

Tenn. Code Ann. § 66-32-114 (2004).

We agree with the trial court's finding that Westgate willfully violated Tennessee Code Annotated §§ 66-32-112 and -114. Westgate clearly failed to provide the Overtons with a current and complete copy of the POS. Although the Overtons requested a written copy of the POS, they were never provided same. Mark Barton, executive director of contract processing at Westgate's corporate headquarters in Florida, testified that it was Westgate's policy at that time to provide purchasers with the outdated POS on CD-ROM plus written copies of the amendments. The Overtons, however, never received such written amendments until after this litigation was commenced, even though Mr. Barton testified that all such written amendments had been transmitted to the Gatlinburg resort.

Amanda Green, the executive director of sales at Westgate's Gatlinburg resort, testified that at the time of the Overtons' purchase, the POS was made available on CD-ROM. She testified that following this incident, she learned Westgate was supposed to

provide the amendments in paper form. Further, it is undisputed that the two CD-ROMs received by the Overtons contained only the outdated versions of the POS as well as other scanned files. According to testimony presented by a computer expert, the electronic information was arguably inaccessible and largely illegible. As the trial court found, the proof demonstrated that by providing only the CD-ROMs, Westgate intentionally delivered information to the Overtons that was basically unusable.

In addition, when it was brought to Westgate's attention in October 2011 that the Overtons had not received a current and complete POS and desired to rescind the contract pursuant to Tennessee Code Annotated § 66-32-114, Westgate refused the request. Although Westgate asserted that the Overtons had received at closing the CD-ROMs containing the POS, Mr. Barton conceded that it was known within the company that the CD-ROMs did not contain the post-2006 amendments to the POS and that paper copies of the amendments had to be provided to the purchaser. This proof demonstrates a willful violation of the Tennessee Time-share Act.

The trial court also found that the Overtons were offered gifts of Owners' Nights and a foosball table without the proper disclosure in violation of Tennessee Code Annotated § 66-32-133. This statutory section provides:

> The following unfair acts or practices undertaken by, or omissions of, any person in the operation of any prize or gift promotional offer, by any means, including, but not limited to, by mail, by telephone, by advertisement or in person, for a time-share project are prohibited:
>
> * * *
>
> (5) Failing to clearly and conspicuously disclose next to each prize, gift, or thing of value offered or any product offered for sale through the promotional plan the item's approximate verifiable retail value, . . . .

It is undisputed that, with regard to the promise of a foosball table and unlimited Owners' Nights, no disclosures were made that listed the respective values of these items.

Further, the trial court found that the promise regarding unlimited Owners' Nights was a fraudulent and intentional misrepresentation by Westgate. Mr. Justice and Mr. Veverka testified that they had been trained to inform potential buyers of the Owners' Nights, which they understood to be unlimited additional nights that could be booked by a timeshare owner at any Westgate resort for $59 per night or more. Mr. Barton testified that he was generally aware of such a program but that it was beyond his scope of specific

10

knowledge. Ms. Green likewise confirmed that such a program did exist. All parties conceded, however, that to their knowledge, this program was not addressed in any of the documentation. Moreover, the letter sent by Westgate's counsel in November 2011 states that "these nights must be approved by a manager and are on a per night basis. . . . Mr. and Mrs. Overton do not have any owner's nights approved for them." Thus, as the trial court found, there is evidence to support the determination that Westgate intentionally engaged in common law fraud and misrepresentation with regard to the promise of Owners' Nights.

As noted above, a defendant acts intentionally when proceeding with a "conscious objective or desire to engage in the conduct or cause the result." *Hodges*, 833 S.W.2d at 901. Further, a defendant "acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation." *Id*. In this transaction, Westgate allowed its salespersons to make promises regarding Owners' Nights that were illusory. Westgate obviously desired to engage in such conduct in order to sell more timeshares. This promise was shown to be a misrepresentation of the facts and certainly produced a false impression, which misled the Overtons into purchasing a timeshare ownership interest. The Overtons made such purchase while believing they were receiving this additional illusory benefit, thus acting to their detriment.

Based on all the proof adduced at trial, the Overtons demonstrated by clear and convincing evidence that Westgate engaged in conduct with regard to this transaction that was intentional and fraudulent, and that it willfully violated the provisions of the Tennessee Time-share Act. For these reasons, we determine that the trial court did not err in ruling that an award of punitive damages was warranted. Further, although the Tennessee Consumer Protection Act does not provide for the remedy of punitive damages, in response to Westgate's third issue, we determine that the trial court correctly ruled that Westgate willfully violated this Act as well.

As applicable to the case at bar, the Tennessee Consumer Protection Act provides:

(a) Unfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices and are Class B misdemeanors.

(b) The following unfair or deceptive acts or practices affecting the conduct of any trade or commerce are declared to be unlawful and in violation of this part:

* * *

> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have;

> * * *

> (12) Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law; . . . .

Tenn. Code Ann. § 47-18-104 (2013).

The trial court found that Westgate had willfully violated these provisions of the Tennessee Consumer Protection Act. We agree that Westgate violated Tennessee Code Annotated § 47-18-104(b)(12).[2] Westgate salespersons were trained to promise unlimited Owners' Nights as a right that would be received by the purchaser along with the timeshare interest. It is undisputed, however, that this promise was not documented in written form. Further, when the Overtons' counsel inquired about the Owners' Nights promised to the Overtons, Westgate's counsel responded that the Overtons had not been "approved" for same. It is clear that Westgate represented that the timeshare interest transaction conferred rights that were not actually involved, thus violating Tennessee Code Annotated § 47-18-104(b)(12).

Following a thorough review of the evidence in this matter, we affirm the trial court's findings that Westgate engaged in intentional and fraudulent conduct and that Westgate willfully violated both the Tennessee Time-share Act and the Tennessee Consumer Protection Act. We find no error in the trial court's determination that an award of punitive damages was warranted.

### V. Amount of Award of Punitive Damages

Alternatively, Westgate asserts that the amount of the punitive damage award was improper and excessive. As our Supreme Court has explained, once a defendant has been

---

[2] Westgate did not violate Tennessee Code Annotated § 47-18-104(b)(5) because a timeshare interest is an estate in real property, *see* Tennessee Code Annotated § 66-32-103, and is not a good or service as defined in Tennessee Code Annotated §§ 47-18-103(7) and (18).

found liable for punitive damages, the amount of such damages shall be determined in a separate proceeding. *See Hodges*, 833 S.W.2d at 901. When determining the proper amount of a punitive damage award, the trial court shall consider the following factors where relevant:

(1) The defendant's financial affairs, financial condition, and net worth;

(2) The nature and reprehensibility of defendant's wrongdoing, for example

(A) The impact of defendant's conduct on the plaintiff, or

(B) The relationship of defendant to plaintiff;

(3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;

(4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;

(5) The expense plaintiff has borne in the attempt to recover the losses;

(6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;

(7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;

(8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

*Hodges*, 833 S.W.2d at 901-02; *see also* Tenn. Code Ann. § 29-39-104. The primary purpose of a punitive damage award is to deter misconduct. *Id*. at 902.

In addition, as this Court recognized in *Wilson v. Americare Sys., Inc.*, No. M2013-00690-COA-RM-CV, 2014 WL 791936 at *2-3 (Tenn. Ct. App. Feb. 25, 2014):

13

After *Hodges*, another layer of analysis was added due to the United States Supreme Court case of *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). As explained in *Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521 (Tenn. 2008):

> The Court [in *Gore*] concluded that due process requires that "a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." Accordingly, the Court adopted three guideposts for determining whether a defendant has adequate notice of the magnitude of the sanction that may be imposed. The first and most important guidepost is the reprehensibility of the defendant's conduct. The Court indicated that the presence of violence, deceit, reckless disregard for the safety of others, or repeated misconduct may be aggravating factors that increase the reprehensibility of the defendant's conduct. The second guidepost is the ratio between the punitive damage award and the actual harm suffered by the plaintiff. Although the Court declined to adopt any strict mathematical formula, it repeated the suggestion from a previous case that "a punitive damages award of 'more than 4 times the amount of compensatory damages' might be 'close to the line'" of constitutional impropriety. The final guidepost requires courts to compare the punitive damage award to civil or criminal penalties that could be imposed for similar conduct. "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.'" These legislative judgments are relevant because they provide defendants with notice of the severity of the penalty that may be imposed upon them.

*Id*. at 537 (internal citations omitted). "When deciding whether a punitive damages award is excessive to the point that it transgresses constitutional due process standards, our review is *de novo* to ensure that the award is based on an application of the law rather than the jury's caprice." *Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175, 190 (Tenn. 2009) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)).

14

*Wilson*, 2014 WL 791936 at *2-3.

Upon a thorough review of the trial court's memorandum opinion, we determine that the trial court properly considered and applied the above-listed factors. With regard to the nine factors set forth in *Hodges*, 833 S.W.2d at 901-02, the trial court examined each factor in turn in accordance with the facts developed at trial. The court engaged in substantial analysis of the first two factors regarding Westgate's financial position and the reprehensibility of the conduct, finding these factors to be the most significant. The trial court opined that, with Westgate's appreciable assets and income, it would "take[] a lot of money to make them feel it." The court noted that in 2011, Westgate generated income of $545,568,329 while owning total assets of $1,389,788,000. In support of the punitive damage award, the trial court observed, "How are you going to deter somebody with that kind of income? It takes more than a slap on the wrist. What is a lot of money to you and me is very little money to Westgate." The court also determined that the conduct of Westgate had a severe negative impact on the Overtons, that Westgate had engaged in "high-pressure tactics," and that Westgate made intentional misrepresentations regarding the transaction.

The court next addressed factors three and four, determining that Westgate's motivation for its conduct was to sell timeshare interests. Furthermore, Westgate's misconduct continued long after the sale as Westgate refused to rescind the contract, causing the Overtons to incur a greater loss of time and money. In applying factors five and six, the court found that the Overtons had expended over $136,000 in attorney's fees and that Westgate profited from its conduct by making a sale. With regard to factor seven, the trial court noted that there was no evidence that Westgate had been subjected to a punitive damage award before. Finally, with reference to factor eight, the court found that Westgate did not take remedial action or attempt to make amends once the misconduct became known to it.

In further support of the award, the trial court discussed the factors elucidated by the U.S. Supreme Court in *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). Those considerations are (1) reprehensibility of the conduct, (2) the ratio between the punitive damage award and the actual harm suffered by the plaintiff, and (3) a comparison of the punitive damage award to civil penalties imposed in comparable cases. *Id*. The High Court explained that "trickery and deceit" were examples of conduct considered to be reprehensible. *Id*. at 576. As stated above, the trial court herein found Westgate's conduct to be exceedingly reprehensible, due to the fact that Westgate made intentional misrepresentations to the Overtons, willfully violated the Tennessee Time-share Act, and refused to rescind the contract despite statutory provisions supporting such rescission.

Westgate contends that the punitive damage award is unconstitutionally disproportional inasmuch as it is approximately sixteen times the amount of the compensatory damage award. As explained by the U.S. Supreme Court, however:

> we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. It is appropriate, therefore, to reiterate our rejection of a categorical approach. Once again, "we return to what we said ... in *Haslip*: 'We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness . . . properly enter[s] into the constitutional calculus.'" In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis. When the ratio is a breathtaking 500 to 1, however, the award must surely "raise a suspicious judicial eyebrow."

*BMW*, 517 U.S. at 582-83 (internal citations omitted). Further, in *Wilson*, this Court affirmed a punitive damage award that was approximately seventeen times greater than the compensatory damage award. 2014 WL 791936 at *7. This Court also pointed out that in *Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175, 195 (Tenn. 2009), there were noted "a number of decisions with higher ratios." *Wilson*, 2014 WL 791936 at *7. Based upon this precedent, we do not find the ratio of punitive damages to compensatory damages in this case to run afoul of due process concerns.

Finally, *BMW* instructs that we must consider the difference between the punitive damage award and the penalties imposed in comparable cases. 517 U.S. at 583. As explained by the High Court:

> Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness. As Justice O'CONNOR has correctly observed, a reviewing court engaged in determining whether an award of punitive damages is excessive should "accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue."

16

*Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S., at 301, 109 S.Ct., at 2934 (opinion concurring in part and dissenting in part). In *Haslip*, 499 U.S., at 23, 111 S.Ct., at 1046, the Court noted that although the exemplary award was "much in excess of the fine that could be imposed," imprisonment was also authorized in the criminal context.

*BMW*, 517 U.S. at 583.

In the case at bar, the Tennessee Time-share Act authorizes a civil right of action against a developer who violates the Act. *See* Tenn. Code Ann. § 66-32-118. It also provides for the imposition of criminal penalties. *See id*. The Tennessee Consumer Protection Act likewise authorizes a civil right of action, criminal penalties, and in certain cases, treble damages. *See* Tenn. Code Ann. § 47-18-101, *et seq*. The trial court herein found that the treble damage award would have been $113,340. We do not find the punitive damage award of $600,000 to be excessive based on the civil penalties that could have been awarded pursuant to the statutes, especially when coupled with the prospect of criminal penalties as well. In any event, the initial two factors identified in *BMW* are often afforded greater weight than the third. *See Wilson*, 2014 WL 791936 at *7. Upon careful review, we therefore determine that the punitive damage award of $600,000 was reasonable, based on applicable factors, and supported by a ratio within a constitutionally acceptable range.

## VI. Applicability of Tennessee Code Annotated § 29-39-104

Determining that the punitive damage award was reasonable based on the applicable factors and constitutional considerations, however, does not end our inquiry. As Westgate points out, the Tennessee Legislature enacted a statutory cap on punitive damages in 2011, which is contained in Tennessee Code Annotated § 29-39-104. This statute provides, in pertinent part:

(a) In a civil action in which punitive damages are sought:

* * *

(5) Punitive or exemplary damages shall not exceed an amount equal to the greater of:

> (A) Two (2) times the total amount of compensatory damages awarded; or

> (B) Five hundred thousand dollars ($500,000);

17

(6) The limitation on the amount of punitive damages imposed by subdivision (a)(5) shall not be disclosed to the jury, but shall be applied by the court to any punitive damages verdict;

* * *

(b) Nothing in this section shall be construed as creating a right to an award of punitive damages or to limit the duty of the court, or the appellate courts, to scrutinize all punitive damage awards, ensure that all punitive damage awards comply with applicable procedural, evidentiary and constitutional requirements, and to order remittitur when appropriate.

Tenn. Code Ann. § 29-39-104 (2011).

Tennessee Code Annotated § 29-39-104 was enacted by Chapter 510 of the Public Acts of 2011, which states: "This act shall take effect October 1, 2011, the public welfare requiring it and shall apply to all liability actions for injuries, deaths and losses covered by this act which accrue on or after such date." Therefore, Tennessee Code Annotated § 29-39-104 will only apply to the case at bar if the Overtons' injury or loss accrued on or after October 1, 2011.

It is undisputed that the Overtons purchased the timeshare interest at issue on July 12, 2011. This was the date of the initial transaction and the date upon which the various promises were made to the Overtons. It is also undisputed, however, that the Overtons did not seek to rescind the contract until October 25, 2011, and their request to rescind was denied by Westgate via letter dated November 28, 2011.

In a recent case involving a claim of fraud, this Court explained that: "Under the discovery rule, a cause of action accrues 'when a plaintiff discovers, or in the exercise of reasonable care and diligence, should have discovered, his injury and the cause thereof.'" *See Berry v. Mort. Elec. Registration Sys.*, No. W2013-00474-COA-R3-CV, 2013 WL 5634472 at *6 (Tenn. Ct. App. Oct. 15, 2013) (quoting *Russell v. Household Mort. Servs.*, No. M2008-01703-COA-R3-CV, 2012 WL 2054388 at *5 (Tenn. Ct. App. June 7, 2012). Therefore, the Overtons' injury based on Westgate's fraud did not accrue until it was discovered by the Overtons. Based on the fact that Westgate's refusal of the Overtons' request for rescission did not occur until November 28, 2011, we determine that their injury did not fully accrue until after October 1, 2011, thus rendering Tennessee Code Annotated § 29-39-104 applicable to this action.

Similarly, a claim under the Tennessee Consumer Protection Act accrues when a plaintiff discovers the unlawful act or practice. *See* Tenn. Code Ann. § 47-18-110; *see*

*also Fortune v. Unum Life Ins. Co. of Am.*, 360 S.W.3d 390, 402 (Tenn. Ct. App. 2010). In the case at bar, the Overtons' claim did not accrue until they discovered that Westgate was guilty of unlawful acts, and this was not made clear until receipt of the above-referenced letter from Westgate's counsel in November 2011, denying that the Overtons were entitled to Owners' Nights. Again, Tennessee Code Annotated § 29-39-104 should have been applied by the trial court to the punitive damage award herein as the injury or loss did not accrue until after October 1, 2011.

Pursuant to the language of Tennessee Code Annotated § 29-39-104 (a)(6), the statutory cap on punitive damages "shall not be disclosed to the jury, but shall be applied by the court to any punitive damages verdict." In this case, where the punitive damage award was set by the trial court after proper consideration of all factors, the court should have then applied the statutory cap and reduced the punitive damage award to $500,000 in accordance with Tennessee Code Annotated § 29-39-104(a)(5). As stated in Tennessee Code Annotated § 29-39-104(b), this Court must still scrutinize the punitive damage award and ensure that it complies with all applicable requirements, as we have done. Thus, while we find that the trial court properly awarded a reasonable amount of punitive damages based on all applicable considerations, we must order remittitur of that award to $500,000 in order to comply with the statutory cap. We therefore determine that the punitive damage award should be reduced to $500,000 in accordance with Tennessee Code Annotated § 29-39-104(a)(5).

## VII. Forum Selection Clause

Westgate posits that the trial court erred in failing to enforce the forum selection clause contained in the parties' contract, which provided that any litigation arising between the parties would take place in Orange County, Florida. The Overtons assert, however, that an action brought pursuant to the Tennessee Consumer Protection Act is to be brought "in the county where the alleged unfair or deceptive act took place." Tenn. Code Ann. § 47-18-109(a)(2) (2013).

The Tennessee Consumer Protection Act further provides:

> (b) Any provision in any agreement or stipulation, verbal or written, restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state with respect to any claim arising under or relating to the Tennessee Consumer Protection Act of 1977 and related acts set forth in this title is void as a matter of public policy.

Tenn. Code Ann. § 47-18-113 (2013). Pursuant to this statutory provision, a contractual forum selection clause "cannot defeat the ability of a Tennessee consumer to bring an

action under the [Tennessee Consumer Protection Act] within the appropriate forum in this state." *See Walker v. Frontier Leasing Corp.*, No. E2009-01445-COA-R3-CV, 2010 WL 1221413 at *5 (Tenn. Ct. App. Mar. 30, 2010).

Further, as Westgate concedes in its brief, the Overtons alleged in their complaint that they were fraudulently induced into entering into the contract, and the trial court found fraud in the transaction.[3]  As we have previously stated, "fraud in the underlying transaction renders a contract clause, such as the forum selection clause at issue here, unenforceable." *Lamb v. MegaFlight, Inc.*, 26 S.W.3d 627, 631 (Tenn. Ct. App. 2000). For these reasons, the trial court properly refused to enforce the forum selection clause contained in this contract.

## VIII.  Attorney's Fees

Finally, the Overtons request an additional award of attorney's fees and expenses on appeal.  The Overtons assert that a plaintiff may be awarded reasonable attorney's fees incurred during an appeal on a claim brought under the Tennessee Consumer Protection Act where one or more of the Tennessee Consumer Protection Act's provisions has been violated. *See Killingsworth v. Ted Russell Ford, Inc.*, 205 S.W.3d 406, 410 (Tenn. 2006). Given the sufficiency of the punitive damage award in this case, however, we do not find it appropriate to grant an additional award of attorney's fees on appeal.

## IX.  Conclusion

For the reasons stated above, we affirm the judgment of the trial court as modified, reducing the punitive damage award to $500,000.  We deny the Overtons' request for an award of attorney's fees on appeal.  Costs on appeal are taxed to the appellant, Westgate Resorts, Ltd., L.P.  This case is remanded to the trial court, pursuant to applicable law, for collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

---

[3] Westgate argues that the Overtons were required to show that they were fraudulently induced into accepting the forum selection clause itself, rather than the contract as a whole, in order to invalidate the forum selection clause, citing *Chaffin v. Norwegian Cruise Line, Ltd.*, No. 02A01-9803-CH-00080, 1999 WL 188295 at *13-14 (Tenn. Ct. App. Sept. 13, 1999).  We find *Chaffin* to be inapplicable, however, because its holding was based on federal maritime law.