IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 20, 2024 Session

## 24HR HOME BUYERS, LLC ET AL. v. LOUIS ROBERTS ET AL.

**Appeal from the Chancery Court for Knox County**
**No. 201219-2          Richard B. Armstrong, Jr., Chancellor**

_____

**No. E2023-00626-COA-R3-CV**
_____

This appeal stems from a contract to purchase real property in Knox County, Tennessee, which ultimately fell through. The intended purchaser filed suit against the property owner seeking to enforce the contract. The property owner brought a counterclaim against the intended purchaser and a third-party claim against the intended purchaser's principal averring that they fraudulently induced him to enter into the contract. After contentious litigation, the trial court entered a default judgment in favor of the property owner as a sanction for ongoing discovery abuses by the intended purchaser and its principal. The intended purchaser and its principal sought relief from the judgment pursuant to Tennessee Rule of Civil Procedure 60.02, which the trial court denied. Discerning no error by the trial court, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Thomas M. Leveille, Knoxville, Tennessee, for the appellants, 24hr Home Buyers, LLC, and Nathan Jackson.

Matthew A. Grossman and Rebekah P. Harbin, Knoxville, Tennessee, for the appellees, Angela Roberts and Louis Roberts.

# OPINION

## BACKGROUND

In January 2020, Nathan Jackson, on behalf of 24hr Home Buyers LLC ("24hr"),[1] and Louis Roberts entered into an Agreement for Purchase of Real Estate (the "Agreement") whereby Mr. Roberts would sell 24hr four parcels of real property in Knox County, Tennessee (together, the "Bluegrass Properties"), and 24hr would pay him $1,000,000. Thereafter, in March 2020, Mr. Jackson, again on behalf of 24hr, and Mr. Roberts executed an Amendment to Real Estate Purchase and Sale Agreement (the "Amendment," or together with the Agreement, the "Contract"), which reduced the purchase price to $637,000. On June 9, 2020, counsel for Mr. Roberts notified 24hr that Mr. Roberts was terminating the Contract for cause, writing in relevant part:

> . . . you induced Louis Roberts into signing these agreements with promises of locating certain other property for him in Loudon County that you would then convey to him. You have undertaken no such efforts in that regard. Second, Louis Roberts does not have good title to convey, as all of his interest in each of these parcels are subject to either or both of spousal interest of his wife and/or a fee interest of his mother. Lastly, based upon the timing of the required earnest money deposit, and based upon the date of the draft from the escrow agent, which my client received by mail, you did not, even accounting for weekends, cause the deposit of the money in a timely manner pursuant and required by the purported contract.

On October 19, 2020, 24hr filed a Verified Complaint in the Knox County Chancery Court (the "trial court") asserting causes of action against Mr. Roberts for breach of contract, fraud, constructive fraud, fraudulent inducement to contract, negligent misrepresentation and against his mother, Ellen Roberts, for tortious interference with contract, seeking compensatory damages, punitive damages, attorney's fees, and specific performance of the Contract. With leave of the trial court, 24hr filed an Amended Verified Complaint on April 22, 2021, substituting Mr. Roberts's wife, Angela Roberts, as defendant in place of Ellen Roberts and asserting an additional cause of action against Angela Roberts for fraudulent inducement to contract.

On February 17, 2021, Mr. Roberts filed a Counter-Complaint against 24hr and a Third-Party Complaint against Mr. Jackson in his individual capacity (24hr and Mr. Jackson together, "the Appellants"). Mr. Roberts asserted causes of action against the Appellants for equitable estoppel, breach of contract, fraudulent inducement, and violation

---

[1] Mr. Jackson is the sole member of 24hr, a Tennessee limited liability company.

of the Tennessee Consumer Protection Act, Tennessee Code Annotated section 47-18-101 *et seq*. (the "TCPA"), and sought compensatory damages, punitive damages, treble damages, attorney's fees, and recission of the Contract. With leave of the trial court, Mr. Roberts and Angela Roberts (together, "the Robertses") filed an Amended Counter-Complaint and Third-Party Complaint on June 1, 2021, replacing Mr. Roberts's cause of action for equitable estoppel with a request for a declaratory judgment. Mr. Roberts averred that from late January 2020 until early March 2020, the Appellants represented to Mr. Roberts "that they would procure a new residence for the Roberts[es,]" (the "Yosemite Property") and that they would transfer the Yosemite Property to Mr. Roberts "in exchange for his agreement [to] reduce the purchase price for the [Bluegrass] Properties equivalently." Although the Amendment did not make any mention of the Yosemite Property, Mr. Roberts purportedly believed that the purchase and conveyance of the Yosemite Property was "part of the agreement" he reached with the Appellants in exchange for his agreeing to reduce the purchase price as memorialized by the Amendment. Mr. Roberts averred that neither of the Appellants intended to actually purchase and convey the Yosemite Property to him but instead represented to him that they would do so in order to induce him to reduce the purchase price for the Bluegrass Properties.

Contentious litigation between the parties ensued. On September 9, 2021, the Robertses noticed Mr. Jackson to two depositions, one in his individual capacity and one in his capacity as a corporate representative of 24hr, to occur in Knoxville on October 5, 2021. In response, on September 15, 2021, the Appellants noticed the Robertses to depositions, also to be held in Knoxville on October 5. However, on September 27, 2021, the Appellants filed a Motion to Attend Depositions via Videoconference. Mr. Jackson alleged that he was a student of naturopathic medicine in San Diego, California, where he was required to attend clinic rotations and in-person classes. He also alleged that he had compromised immunity to Covid-19. Given that he was already scheduled to travel to Knoxville for trial in this matter on November 19, 2021, he stated that traveling to Knoxville for the depositions "would place [his] health at risk and delay his recovery and ability to return to classes." The Appellants then filed a Motion to Continue Depositions on September 30, 2021. The Robertses opposed the Appellants' motions, and neither of the motions was heard prior to October 5, 2021. On October 4, 2021, the Appellants filed a motion to continue the trial, and Appellants' counsel emailed the Robertses' counsel to inform them that no depositions would take place on October 5. The Robertses opposed the Appellants' motion to continue the trial and moved that the trial court instead involuntarily dismiss 24hr's amended complaint and strike the Appellants' answers to Mr. Roberts's amended countercomplaint and third-party complaint as a sanction for Mr. Jackson's failure to appear for the depositions. On January 21, 2022, the trial court entered an Order continuing the trial, denying the Robertses' motion for involuntary dismissal, permitting the parties to attend depositions via videoconference, and granting counsel for

the parties "the opportunity to conduct follow up depositions in-person in the immediate days preceding a trial in this matter."

On August 17, 2022, counsel for the Appellants moved to withdraw from further representation of the Appellants. In support thereof, counsel stated that the Appellants requested that counsel "cease all work on this matter and withdraw from representation." The trial court entered an order on September 15, 2022, granting the motion to withdraw and granting the Appellants thirty days in which to retain new counsel.

On September 13, 2022, the Robertses filed a motion to compel the Appellants to fully respond to all outstanding discovery requests. As relevant to this motion, the record reveals that on October 8, 2021, the Appellants responded to discovery requests but objected to requests that they produce their bank records and tax returns as "overbroad, cumulative, overly burdensome, and irrelevant to the Contract at issue in the present case." At a subsequent videoconference deposition of Mr. Jackson, counsel for the Appellants agreed to produce any communications between 24hr or Mr. Jackson and third parties regarding the Bluegrass Properties and to produce the Appellants' tax returns, subject to a protective order. However, the Appellants never produced such documents. The Appellants, through their new counsel, filed a response in opposition to the motion to compel on September 22, 2022.

After a number of continuances, the trial in this matter was scheduled to begin on November 1, 2022. On October 18, 2022, the trial court heard pre-trial motions, including the Robertses' motion to compel, which it granted. The trial court subsequently entered an order requiring Appellants to "produce the documents responsive to the Roberts[es]' requests for financial information, communications with third parties with respect to the subject matter of this lawsuit, and contracts with third parties on or before October 27, 2022."

On October 27, 2022, the Appellants supplemented their discovery responses. However, instead of producing their bank records and tax returns, they responded that any responsive documents were not "accessible" to them at that time. The following day, the Robertses took Mr. Jackson's supplemental deposition. With regard to why he could not access the Appellants' bank records and tax returns, Mr. Jackson testified:

> Q    Did you contact [24hr's bank] to ask for any bank records?
> A    Actually, let's see, I actually did. I did.
> Q    What was their response?
> A    I don't know.
> Q    When did you contact [24hr's bank]?
> A    This was after, gosh, I want to say maybe a few days after I got

the request for this, so . . .

Q      A few days after you got the request for this?

A      Yeah.

Q      Could you be more specific. Was it after you got our Motion to Compel production?

A      Yeah.

* * *

Q      Did [24hr's bank] refuse to provide records to you?

A      Oh, no, I just inquired.

Q      What did you ask them?

A      What was all necessary to allocate documents.

Q      Are you able to look at your -- do you get monthly bank statements from [24hr's bank]?

A      Do I get monthly bank statements?

Q      24hr, does 24hr Home Buyers get monthly bank statements?

A      They all get mailed out, so.

Q      Do you check your mail?

A      Yeah, I do.

Q      How often?

A      I would say when it's necessary. And I think we already discussed this in our previous deposition of how my mail gets handled, so there's no reason to really go back into that. We've covered all those grounds.

Q      So you get monthly bank statements from [24hr's bank].

A      Pretty sure, yeah.

Q      Do you save those bank statements?

A      I don't save bank statements.

Q      How often do you access your bank account to see what your balance is?

A      Rarely, honestly.

* * *

Q      And when you contacted [24hr's bank] to ask for the records what did they tell you?

* * *

A      I think when you put some context into that, I did not call as a personal, you know, representative from my business. It was just a general like question to like their 1-800, so it's not like, hey, this is who I am. This is my account. Tell me how much I have, and tell me what I need to get this. No, it's a customer service like help line.

* * *

Q      Why didn't you call and identify that you were a customer of [24hr's bank]?

A        I have no clue what you're talking about.

Q        Well, you said that you called the 1-800 help line, and you didn't say, hi, this is my account, this is who I am. Why didn't you tell them that?

A        Why would I? What's the importance of that? Again, I don't understand what you're talking about.

Q        So the --

A        Whether I called or not, like it's -- it makes no difference who I said I was when I called. Like whether I'm a member, or whether I'm not a member. The fact of the matter is, I am asking for information that's pertinent to this right here. I think that's the main, like objective here that we should be focusing on.

Q        Do you believe that you complied with the requirements of this discovery response in obtaining the information thus far?

A        To the best of my abilities, yes.

* * *

Q        How do you usually access your balance information?

A        I just go to the bank.

Q        You physically go into the bank every time you access your balance information?

A        Or I'll do it through like an ATM.

Q        Do you have an online account where you can see your accounting information, or your account information for [24hr's bank]?

A        I don't use online, no.

* * *

Q        Do you maintain your tax returns?

[APPELLANTS' COUNSEL]:      Are we talking about 24hr or individually?

[ROBERTSES' COUNSEL]:      24hr.

A        Yeah. I'm sorry.

Q        Who prepares your taxes?

A        It is a tax accountant, or whatever you want to call it. CPA or whatever.

Q        How does that accountant provide you with a fully completed IRS return?

A        Don't know what you're talking about.

* * *

Q        Did they email you a copy of it?

A        I believe so, yeah.

Q        Do you have access to that email?

A        I have access to the email but not at this time.

Q When you say at this time, do you mean at this moment, or could you go to your computer right now and get access to that email?

A Could I? I would need to see if that's possible. At this time it's not accessible right now.

Q Was it accessible when you submitted this on October 27th?

A It was not accessible at that time.

Q Why was it not accessible?

A Because it's not accessible at this time.

Q Do you know your email and password?

A Do I know my email password?

Q Yes.

A Yeah, I know my email password.

Q So tell me why it wasn't accessible on October 27th.

A Because it wasn't accessible at that time. I mean this is in my -- I mean I'm just not sure what you want me to answer. Just not accessible.

Q But you have the password. You know your email address. You received an email from your accountant --

A Uh-huh (affirmative).

Q -- and it's not accessible to you.

      * * *

A Yeah, that makes no sense. So what you're basically trying to say is that I had every opportunity to be able to take out and look at that email and retrieve the tax returns; is that what you're asking? Because that's an incorrect like misconstruement [*sic*] of like the questions that you're asking me right now.

Q I'm asking you if you have access to your email account?

A Yeah, I have access to my email account.

Q Did you get an email with your 2021 tax returns from the CPA who prepared them for you?

A I may have.

Q Okay. If you can go find that for me --

A For you?

Q -- can we make that a late filed exhibit to this deposition?

A Objection to everything. So --

Q Sir, your attorney can object, you can't.

A Okay.

THE WITNESS: So object to that, Mark.

[APPELLANTS' COUNSEL]: I guess at this point since we're three days from trial I'd object to late filed, but we'll see what happens.

      * * *

Q    Do you receive monthly banking statements from [Mr. Jackson's bank]?

A    No, I don't.

Q    How do you know how much your balance is in your bank account?

A    I just call up there.

Q    What's their phone number?

A    I don't know.

Q    Would you get it for me?

A    No.

Q    Why not?

A    Because I don't want to. It's not necessary because I just gave you the [name of the bank]. And they do have a website, and it's online, and I'm telling you it's going to be that number, so feel free.

* * *

Q    And how do you find out your balance? You do not receive monthly statements but you do call them to find out your balance.

A    Correct.

Q    Do you ever check online?

A    No, no online banking.

* * *

Q    Did you call [Mr. Jackson's bank] anytime in the last month to ask about how you could possibly get a copy of your bank records?

A    No, I did not. Not to my knowledge.

Q    Why not?

A    I don't know.

Q    Were you aware that the Roberts[es] had requested this information from you?

A    I was aware that it was for 24hr Home Buyers. That's what I was aware of.

* * *

Q    And so Nathan Jackson individually did not contact his bank to obtain any records?

A    From my knowledge, yeah. Yeah, from my knowledge.

* * *

Q    And so when you testified that you think it's above $50,000.00, you have no way to know whether it's above $60,000.00, your income. I'm asking about your income.

A    You're asking do I have any way -- yeah, I have a way to find out how much I made, yeah. I can find that out for sure.

Q    Is that something that you can provide to us?

- 8 -

A     I'm not going to provide that to you. I object to that.

Q     You can't make objections.

THE WITNESS:     You have to object to that.

[APPELLANTS' COUNSEL]:     No, I don't think I can. It's a fair question, so I think you need to that [*sic*].

THE WITNESS:     On what basis?

[APPELLANTS' COUNSEL]:     It's relevant to potentially punitive damages. That's what it's relevant to.

The only document produced by the Appellants as part of their supplemental discovery responses was a portion of an agreement (the "Third-Party Agreement") between 24hr and a third party to whom 24hr was intending to assign its rights under the contract and/or sell the Bluegrass Properties.  When asked about the Third-Party Agreement, Mr. Jackson testified that it showed "just the level of integrity that [the Appellants] had after the lawsuit was actually filed."  However, after further questioning, he testified: "First of all, why we presented this to you in the first place is to show you, potentially, like the damages that I was facing, right? That's why we sent this to you in the first place."

Immediately after this supplemental deposition on October 28, 2022, the Robertses filed a motion for involuntary dismissal of 24hr's amended complaint and motion to strike the Appellants' answer to Mr. Roberts's amended countercomplaint and third-party complaint as discovery sanctions (the "Sanctions Motions").  The Robertses argued the requested sanctions were appropriate given Mr. Jackson's failure to appear for the October 2021 depositions and the Appellants' "other consistent abuses of the discovery process[.]"  In support of these motions, the Robertses filed complete transcripts of Mr. Jackson's June 2022 videoconference deposition and October 28 supplemental deposition.  The trial court heard the Sanctions Motions on October 31, 2022, the day before trial was scheduled to begin.  During this hearing, Appellants' counsel stated to the trial court:

> [APPELLANTS' COUNSEL]:     Your Honor, I'd rather not be here either because frankly I feel like I'm in a conflict position. I've got to represent -- I've got to represent a client. At the same time I'm an officer of this court and I've got to follow rules and make sure things are done. So I'm in a -- I'm in a bad spot here today quite frankly. And it might be a spot that I frankly need to get out of here on.
>
> THE COURT:     I hear you, Counsel.
>
> * * *
>
> [APPELLANTS' COUNSEL]:     . . . I responded on Thursday, the 27th, but I didn't have anything to respond with, and I felt like I needed to respond in some way shape or form because otherwise to not do it would be contempt I felt like. So I, again, as an officer of the Court I felt like I needed

- 9 -

to respond. Not trying to sit here and make myself look good. I take responsibility for anything that happens.

. . . and I can't get into obviously attorney-client privileged matters, but I made my client aware of their responsibility to produce documents.

Now, I have really not much of an explanation for how things played out. Mr. Jackson can explain it, and I would offer him up as a witness to do so under oath, if that would be appropriate, your Honor.

THE COURT: Send him up.

Thereafter, Mr. Jackson testified:

[APPELLANTS' COUNSEL]: Okay. Well, could you explain to me why we didn't have any documents on October 27th?

A Yeah. So basically, you know, as I stated in my response, you know, I did the best that I could. I did the best in that deposition as well, too, when I told [the Robertses' counsel] and, yeah, that's that. A lot of the documents that you requested, as far as being inaccessible, I assume that these things are destroyed, and so they'll be able to produce anything to actually put together a complete analysis for proper discovery would, it would have, you know, been inadequate and not in, you know, my favor obviously, so, yeah. That answers your question.

* * *

[ROBERTSES' COUNSEL]: And so at your deposition were you aware of an obligation to produce your tax returns?

A Yeah, and so how I understood that, what you just read, I read what [co-counsel] initially put down. He stated that I agreed to, you know, produce my tax returns basically, and so with that, you know, I honestly didn't want to commit perjury and go along with that because I -- again this is my interpretation of what I thought the law was, and so I guess with that it was posed as if I agreed to give him the tax returns, and so that's the way I was like interpreting that. But I did not, and so, yeah, that's literally, you know, kind of what I was interpreting so.

* * *

[ROBERTSES' COUNSEL]: You testified earlier that a lot of the documents that we were seeking had been destroyed. How were they destroyed?

A I mean, I don't save every single document. I think that after hearing [co-counsel] speak, he basically was stating that he was adamant on receiving assignment of contracts. These are things that -- and this is for the sole basis of finding a pattern of talking -- you know, down talking homeowners, which, you know, in all honesty you won't find, but I believe

- 10 -

that he can get those documents and I think that I could possibly get those documents during trial. I just think that I may need to make a few calls, but I don't have access to these assignments. I don't -- I don't save documents. And so when I say that they're not accessible -- inaccessible at this time, you know, that's true.

\* \* \*

[ROBERTSES' COUNSEL]: Do you feel like you're only obligated to produce documents that are in your favor?

A  No, I'm not saying that. I'm saying that when I was looking at the motion to respond, a lot of these things said all of these documents, and so -- but now that I hear that [co-counsel] is basically stating that, oh, no, I want to see tax returns and I want to see, you know, these assignment contracts that you are in possession of, which, you know, I'm not in possession of, to see a pattern, you know, that's where it's like okay, that's what you're trying to do. So, yeah, that's what I kind of get from everything.

At the conclusion of the hearing, the trial court entered an order granting the Sanctions Motions (the "Sanctions Order"), which we quote in full:

Under the facts of this case, the [Robertses] have requested discovery during the entire duration of this case of tax documents, bank documents and contract documents as early as July of 2021. The facts and pleadings show that [Mr. Jackson] failed to appear to a deposition on or about October 5, 2021, agreed through counsel to produce those documents at his deposition on June 8 of 2022, and [Mr. Jackson] has failed to produce those documents. On October 18, 2022, this Court entered an Order compelling production of those documents.

At today's hearing, [Mr. Jackson] testified, and through some back and forth, ultimately stated that he could produce the documents at trial, if needed. The Court finds and concludes that [Mr. Jackson] violated the Order entered on October 18, 2022. The Court further finds and concludes that [Mr. Jackson] was not credible in his testimony today. Upon careful review of the pleadings and depositions in this case, the Court, in its discretion and under the traditional notions of fair play and substantial justice, now finds and ORDERS that [the Robertses'] request, although drastic, is appropriate under the facts and circumstances of this case. Therefore, the Court will GRANT the Motion to Strike and the Motion for Involuntary Dismissal under the authority given to it pursuant to Tenn. R. Civ. P. 37.02(C).

- 11 -

On November 4, 2022, the trial court entered a Supplemental Order incorporating the Sanctions Order and entering judgment against the Appellants by default as to all claims asserted against them.

Soon thereafter, on November 9, the Appellants' second counsel filed a motion to withdraw, stating that counsel and the Appellants "mutually agreed to a termination of their attorney-client relationship." On December 9, 2022, the trial court entered an order granting the motion to withdraw. However, the trial court declined the Appellants' request for additional time to obtain new counsel prior to a writ of inquiry, which was scheduled to be heard on December 14, 2022. Following a writ of inquiry, the trial court entered a judgment in favor of Mr. Roberts on December 14, 2022 (the "Final Judgment"), awarding him $7,500 in actual and treble damages and $43,542.50 in attorney's fees and expenses, all pursuant to the TCPA.

On January 17, 2023, the Appellants, through new counsel, filed a Motion for Relief from Order pursuant to Tennessee Rule of Civil Procedure 60.02. Therein, the Appellants argued that the Final Judgment "should be set aside and [the Appellants] should be permitted to try this case on the merits" because (1) the Appellants "ha[d] become aware that [the Robertses] withheld documentary evidence that would have disproven their affirmative defenses and claims against" the Appellants; (2) "misrepresentations [were] made to the [trial court] during the hearing on the [Sanctions Motions] about [Mr.] Jackson's efforts to appear for a deposition"; and (3) "the record evidences excusable neglect by [the Appellants'] then-counsel in being unprepared at several appearances in the case." In support of the Rule 60.02 motion, Mr. Jackson filed a Declaration explaining that the Appellants had discovered "new evidence" consisting of a January 2020 email from a real estate agent to Angela Roberts regarding the Yosemite Property and a purchase contract prepared by the real estate agent in late January 2020, pursuant to which the Robertses agreed to purchase the Yosemite Property (the "new evidence"). The Appellants argued that this new evidence "disproves [the Robertses'] entire theory of the case" because it "shows [that the Robertses] could not have reasonably relied on the alleged representation that 24hr would purchase the Yosemite Property for them in March 2020, because they already had a real estate agent representing them in their efforts to purchase that property in January 2020." An unauthenticated copy of the new evidence was attached to Mr. Jackson's Declaration. The trial court heard the Appellants' Rule 60.02 motion on March 27, 2023; however, the record does not contain a transcript or statement of the evidence from this hearing. On March 30, 2023, the trial court entered an order denying the Rule 60.02 motion, stating:

> Upon argument of counsel and the record as a whole in this matter, the [trial court] finds that [the Appellants] have failed to present the [trial court] with clear and convincing evidence for any of the three (3) bases upon which they

have moved the [trial court] to grant relief as required by Tenn. R. Civ. P. 60. Moreover, the [trial court] also finds that none of the "newly discovered evidence" upon which [the Appellants] rely is admissible for purposes of Rule 60 relief. Further, the [trial court] finds that none of the evidence provided by [the Appellants] are material insofar as it would not have altered the decision of the [trial court] provided in the October 31, 2022 order. Accordingly, [the Appellants'] Motion is **DENIED**.

The Appellants appeal the denial of their Rule 60.02 motion.

## ISSUES

The Appellants raise several issues on appeal, all of which we consolidate and restate as a single issue:

1.      Whether the trial court erred in denying the Appellants' Rule 60.02 motion.

In their posture as Appellees, the Robertses respond to Appellants' issues and present additional issues for this Court's review, which we consolidate and restate as:

2.      Whether the Appellants have waived certain arguments concerning the hearing on their Rule 60.02 motion by failing to file a statement of the evidence or transcript of the hearing.

3.      Whether the Robertses are entitled to an award of their attorney's fees incurred on appeal.

## STANDARD OF REVIEW

Rule 60.02 provides, in part:

On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that a judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment.

- 13 -

Tenn. R. Civ. P. 60.02.  To obtain relief under Rule 60.02, the moving party must "establish by clear and convincing evidence that [they are] entitled to relief."  *Hussey v. Woods*, 538 S.W.3d 476, 483 (Tenn. 2017) (quoting *McCracken v. Brentwood United Methodist Church*, 958 S.W.2d 792, 795 (Tenn. Ct. App. 1997)).  "Evidence is clear and convincing when it leaves 'no serious or substantial doubt about the correctness of the conclusions drawn.'"  *Id.* (quoting *Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175, 187 (Tenn. 2009)).

Our Supreme Court has set forth the standard of review applicable to an order denying a motion to set aside a judgment:

> Tennessee law is clear that the disposition of motions under Rule 60.02 is best left to the discretion of the trial judge.  *Underwood v. Zurich Ins. Co.*, 854 S.W.2d 94, 97 (Tenn. 1993); *Banks v. Dement Constr. Co.*, 817 S.W.2d 16, 18 (Tenn. 1991); *McCracken v. Brentwood United Methodist Church*, 958 S.W.2d 792, 795 (Tenn. Ct. App. 1997).  The standard of review on appeal is whether the trial court abused its discretion in granting or denying relief.  This deferential standard "reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives," and thus "envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal."  *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).
>
> A trial court abuses its discretion when it causes an injustice by applying an incorrect legal standard, reaching an illogical decision, or by resolving the case "on a clearly erroneous assessment of the evidence."  *Id.* The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.  *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).  Indeed, when reviewing a discretionary decision by the trial court, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision."  *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999); *see also Keisling v. Keisling*, 196 S.W.3d 703, 726 (Tenn. Ct. App. 2005).

*Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010).  Likewise, this Court will not disturb a trial court's decision on admissibility of evidence unless "there is a showing of abuse of discretion."  *Danny L. Davis Contractors, Inc. v. Hobbs*, 157 S.W.3d 414, 419 (Tenn. Ct. App. 2004).  Finally, "[i]f the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary."  *Franklin Cnty. Bd. of Educ. v. Crabtree*,

337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) (citing *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002)).

a.

The Appellants first argue that the trial court erred in failing to conduct an evidentiary hearing on their Rule 60.02 motion. It is undisputed that a hearing on their Rule 60.02 motion occurred on March 27, 2023; however, there is no transcript or statement of the evidence from that hearing in the record. To the extent the Appellants raise issues stemming from said hearing, it was the Appellants' responsibility to file a transcript or statement of the evidence allowing us to fully review the proceeding. The Robertses argue that the Appellants waived this issue by failing to file a transcript or statement of the evidence from the hearing. We do not agree this failure results in a waiver of this issue; nevertheless, "[i]n the absence of a transcript or statement of the evidence, a presumption arises that there was sufficient evidence to support the trial court's judgment." *In re Est. of Henderson*, 121 S.W.3d 643, 647 n.5 (Tenn. 2003) (citing *Mfrs. Consol. Serv. v. Rodell*, 42 S.W.3d 846, 865 (Tenn. Ct. App. 2000)).

The Appellants do not cite any authority that requires that the trial court hold an evidentiary hearing when considering a Rule 60.02 motion. Instead, they rely upon two cases in which this Court found that the trial court erred because it did not hold an evidentiary hearing. However, the specific facts of those cases are easily distinguishable from the facts herein. First, the Appellants rely on *Howard v. Howard*, No. E2022-01385-COA-R3-CV, 2023 WL 6465223 (Tenn. Ct. App. Oct. 4, 2023), *no perm. app. filed*. In *Howard*, the plaintiff in a divorce proceeding sought relief pursuant to Rule 60.02 from an attorney's fee provision contained within a final divorce decree. 2023 WL 6465223, at *1. Notably, the plaintiff was not seeking relief from the entirety of the final divorce decree, only the attorney's fee provision contained therein. *Id.* at *3. At a hearing on the plaintiff's Rule 60.02 motion, the trial court allowed the parties' counsel to make opening arguments. *Id.* Before they had the opportunity to present witness testimony, the trial court instructed the parties to file briefs regarding whether it could set aside a portion of the final divorce decree without setting aside the entirety of the judgment. *Id.* at *3–4. When instructing the parties to complete such briefing, the trial court said, "[a]nd we'll hear you again in a week or two[.]" *Id.* at *4. The parties filed their respective briefs "within a few days following the hearing[;]" however, the trial court ultimately entered an order denying the Rule 60.02 motion "without conducting any further hearing or accepting evidence on the matter" and without stating a basis for its ruling. *Id.* This Court vacated the trial court's order "due to the trial court's failure to hear the parties' evidence on the Rule 60.02 motion and the lack of a stated basis for the [trial] court's ruling." *Id.* at *5.

The Appellants also rely on *Johnson v. Johnson*, No. 01-A-01-9209-CH-00340, 1993 WL 82320 (Tenn. Ct. App. Mar. 24, 1993), another divorce case. In *Johnson*, the plaintiff sought relief pursuant to Rule 60.02 from a property settlement agreement that was incorporated in the final divorce decree due to fraud by the defendant. 1993 WL 82320, at *1. However, "the trial court refused to conduct an evidentiary hearing on the [plaintiff's] claim of fraud, finding that [he] was estopped" from obtaining relief from the final divorce decree because the plaintiff had subsequently remarried. *Id*. "Moreover, the trial court refused to allow the [plaintiff] to present an offer of proof, making review of the [plaintiff's] claim by this [C]ourt difficult if not impossible." *Id.* (citing *Bray v. State*, 450 S.W.2d 786, 787 (Tenn. Crim. App. 1969)). This Court concluded that the trial court erred in holding that the plaintiff's remarriage estopped him from seeking relief from the property settlement agreement and that the plaintiff's "allegations [in support of his Rule 60.02 motion were] sufficient to require a hearing." *Id.* at *2.

Unlike in *Howard* and *Johnson*, there is no indication in the record before us that the Appellants requested an evidentiary hearing on their Rule 60.02 motion, that the trial court refused to conduct an evidentiary hearing, or that the trial court indicated it would conduct an evidentiary hearing and then failed to do so. The Appellants argue that "[i]f the issue [with the admissibility of the new evidence] is simply a matter of authentication . . . the documents could and would have been easily authenticated through testimony at an evidentiary hearing[.]" However, there is no indication in the record that the Appellants attempted to present any witness testimony or otherwise attempted to authenticate those documents at the hearing on their Rule 60.02 motion. "Tennessee law is well-established that a party who invites or waives error, or who fails to take reasonable steps to cure an error, is not entitled to relief on appeal." *State v. Banks*, 271 S.W.3d 90, 170 (Tenn. 2008) (citing Tenn. R. App. P. 36(a)). Accordingly, under these circumstances, we cannot conclude that the Appellants are entitled to relief on appeal based upon the trial court's purported failure to conduct an evidentiary hearing on their Rule 60.02 motion.

Next, the Appellants argue that they are entitled to relief from the Final Judgment because the new evidence offered in support of their Rule 60.02 motion demonstrated fraud, misrepresentation, or misconduct by the Robertses. Specifically, they posit that the new evidence defeats the Robertses' claim that they were relying upon representations by 24hr and/or Mr. Jackson to purchase the Yosemite Property for them. They also argue that the Robertses should be sanctioned because they intentionally concealed this evidence from the Appellants and because Angela Roberts perjured herself when asked about the existence of any such evidence during her pre-trial deposition. The trial court found that none of this new evidence "is admissible for purposes of Rule 60 relief" nor is it "material insofar as it would not have altered the decision of the [trial court] provided in the [Sanctions Order]." It was the Appellants' responsibility to ensure the proffered evidence was in an admissible form, and, as discussed above, they failed to do so.

Moreover, the Appellants essentially argue that they would have overcome the Robertses' defenses and Mr. Roberts's counterclaim/third-party claim on the merits had the Robertses produced the new evidence in discovery. However, because the basis of the dismissal was not the Robertses' defenses, but rather Appellants' actions, this argument is inapposite. The trial court did not dispose of this case on the merits. Instead, it dismissed the Appellants' claims against the Robertses and granted Mr. Roberts a default judgment due to the Appellants' ongoing discovery abuses. Accordingly, we conclude that the trial court did not abuse its discretion in determining that the new evidence was not a basis for Rule 60.02 relief.

The Appellants also argue that the trial court granted the Sanctions Motions based on misrepresentations made by the Robertses at the October 31, 2022 hearing on those motions. In their motion for involuntary dismissal, the Robertses argued that dismissal was warranted due to the Appellants' "consistent abuses of the discovery process," including Mr. Jackson's failure to appear for the October 2021 depositions. The trial court "in its discretion and under the traditional notions of fair play and substantial justice," found that "under the facts and circumstances of this case," the Sanctions Motions should be granted. When explaining the facts and circumstances that supported its holding, the trial court noted, in part, that the record showed that Mr. Jackson failed to appear at the October 2021 depositions. The Appellants object to the trial court's reference to Mr. Jackson's failure to appear for the October 2021 depositions and argue that the record does not reflect a pattern by the Appellants of avoiding discovery.

Importantly, however, the trial court's dismissal order did not reference *only* Mr. Jackson's failure to appear at the October 2021 depositions. As the trial court explained in the order, the Appellants also withheld documents requested by the Robertses without a valid basis for doing so. Then, the Appellants ignored the trial court's order compelling them to produce such documents. Finally, the trial court found that Mr. Jackson's explanations for the Appellants' withholding of these documents were not credible.

"Rule 37.02(C) of the Tennessee Rules of Civil Procedure provides that a trial court faced with a party who fails to obey an order to provide discovery may render a judgment by default against the disobedient party." *Shahrdar v. Glob. Hous., Inc.*, 983 S.W.2d 230, 236 (Tenn. Ct. App. 1998) (citing *Yearwood, Johnson, Stanton & Crabtree, Inc. v. Foxland Dev. Venture*, 828 S.W.2d 412 (Tenn. Ct. App. 1991)). "Although this sanction is extreme, it is appropriate 'where there has been a clear record of delay or contumacious conduct.'" *Id.* (quoting *In re Beckman*, 78 B.R. 516, 518 (M.D. Tenn. 1987)). "Contumacious conduct means '[w]illfully stubborn and disobedient conduct, commonly punishable as contempt of court.'" *SpecialtyCare IOM Servs., LLC v. Medsurant Holdings, LLC*, No. M2017-00309-COA-R3-CV, 2018 WL 3323889, at *18 (Tenn. Ct. App. July 6, 2018)

(quoting *Am. Exp. Centurion Bank v. Lowrey*, No. E2011-01247-COA-R3-CV, 2013 WL 937831, at *5 (Tenn. Ct. App. Mar. 11, 2013)).

In *Shahrdar*, the defendants failed to respond to multiple discovery requests or responded to such requests with "'boilerplate objections' despite court orders to comply" with such requests. 983 S.W.2d at 236. Similarly, when the *Shahrdar* plaintiff deposed the defendants' corporate representative about various specified topics, the witness claimed ignorance, despite having been designated by the defendants to testify about those topics. *Id.* The trial court granted plaintiff a default judgment due to the defendants' failure to comply with its discovery orders, and this Court affirmed the trial court's grant of default judgment. *Id.* Like the defendants in *Shahrdar*, the Appellants' conduct in this case can be described as "uncooperative at best." *See Shahrdar*, 983 S.W.2d at 236. Setting aside the October 2021 depositions, Mr. Jackson made clear in both his October 18, 2022 deposition testimony and his testimony to the trial court that he had no intention of producing any of the Appellants' bank records or tax returns, even in the face of a trial court order compelling him to do so. His answers were often flippant and nonsensical. It is clear from the record that the only thing stopping the Appellants from producing these documents was Mr. Jackson's unwillingness to do so. Accordingly, the trial court did not abuse its discretion in granting Mr. Roberts a default judgment as a sanction for the Appellants' ongoing discovery abuses.

Finally, the Appellants argue that they are entitled to Rule 60.02 relief because their counsel "exhibited excusable neglect by failing to become prepared enough to adequately represent the[ir] interests" at the October 31, 2022 hearing. However, the sanction granted by the trial court at the conclusion of that hearing was a direct result of Mr. Jackson's choice not to cooperate in discovery, not a result of counsel's lack of preparedness. Again, like the defendants in *Shahrdar*, the Appellants here had "ample opportunity" to produce the requested documents and failed to do so.

Without the benefit of a transcript or statement of the evidence allowing us to know what happened at the hearing on the Appellants' Rule 60.02 motion, we must presume that there was sufficient evidence to support the trial court's denial of their Rule 60.02 motion. Moreover, we must presume that the trial court's denial of the Appellants' Rule 60.02 motion is correct, and we must review the evidence in the light most favorable to the decision. Given these presumptions, and having carefully reviewed the record before us, we conclude that the trial court did not abuse its discretion by denying the Appellants' Rule 60.02 motion.

b.

The Robertses argue that the TCPA entitles them to an award of their attorney's fees incurred on appeal because the trial court awarded them their attorney's fees incurred as part of the trial court proceedings. "[A] plaintiff may be awarded reasonable attorney's fees incurred during an appeal on a claim brought under the TCPA where one or more of the TCPA's provisions has been violated." *Killingsworth v. Ted Russell Ford, Inc.*, 205 S.W.3d 406, 410 (Tenn. 2006); *see* Tenn. Code Ann. § 47-18-109(e)(1) ("Upon a finding by the court that a provision of [the TCPA] has been violated, the court may award to the person bringing such action reasonable attorney's fees and costs.")

Mr. Roberts asserted causes of action against the Appellants for declaratory judgment, breach of contract, fraudulent inducement, and violation of the TCPA. The trial court granted him a default judgment on these claims, including his TCPA claim, and determined that he was "entitled to judgment for his actual damages, plus treble damages, plus reasonable attorney['s] fees and expenses, all pursuant to the [TCPA]." We exercise our discretion under the TCPA and award Mr. Roberts his attorney's fees related to this appeal. These fees are to be taxed against the Appellants, jointly and severally. The trial court should determine a reasonable award of fees and expenses for this purpose on remand.

## CONCLUSION

The judgment of the Chancery Court for Knox County is hereby affirmed. The costs of this appeal are taxed jointly and severally to the appellants, 24hr Home Buyers, LLC and Nathan Jackson, for which execution may issue if necessary. This case is remanded for further proceedings consistent with this Opinion.

_____
KRISTI M. DAVIS, JUDGE